# EXHIBIT 13

http://www.ascap.com/licensing

# GENERAL LICENSE AGREEMENT - RESTAURANTS, BARS, NIGHTCLUBS, AND SIMILAR ESTABLISHMENTS

Agreement between American Society of Composers, Authors and Publishers ("ASCAP"), located at 2 Music Square West, Nashville, TN 37203 and

LICENSEE Legal Name: _____

LICENSEE Business Name: _____

Address: _____

_____

Tel: _____  Fax: _____  Email: _____

(*Check one*)  ☐ Individual Owner  ☐ Corporation  ☐ Partnership  ☐ LLC  ☐ Other _____

as follows:

### 1. Grant; Term of License

(a)  ASCAP grants, and LICENSEE accepts, for a term of one (1) year, commencing _____ and continuing thereafter for additional terms of one (1) year each unless terminated by either party as hereinafter provided, a license to perform publicly at the premises located at (*check one*) ☐ same legal address as above ☐ same mailing address as above ☐ (other address; *please complete*) _____

_____

(the "Premises"), and not elsewhere, non-dramatic renditions of the separate musical compositions now or hereafter during the term hereof in the ASCAP Repertory (*see definitions below*).

(b)  This Agreement shall operate to the benefit of, and shall be binding upon, the parties hereto and their respective successors and assigns.  Any assignment of this Agreement shall require ASCAP's prior written approval.  No assignment shall relieve the parties hereto of their respective obligations hereunder as to performances rendered, acts done and obligations incurred prior to the effective date of the assignment, provided, however, that assignee may accept the obligations of assignor upon written notice to ASCAP.

(c)  Either party may, on or before thirty (30) days prior to the end of the initial term or any renewal term, give notice of termination to the other.  If such notice is given, the Agreement shall terminate on the last day of such initial or renewal term.

(d)  Upon a change in the Premises address, LICENSEE shall notify ASCAP immediately of such new address, which shall be incorporated herein.

### 2. Limitations on License

(a)  This license does not authorize the broadcasting, telecasting or transmission by wire or otherwise, of renditions of musical compositions in the ASCAP Repertory to persons outside of the Premises, other than by means of a music-on-hold telephone system operated by LICENSEE at the Premises.

(b)  This license does not authorize live concert performances at the Premises when tickets for such live concert performances can be purchased from or through Outside Ticket Services (*see definitions below*).

(c)  This license is limited to non-dramatic performances, and does not authorize any dramatic performances.  For purposes of this Agreement, a dramatic performance shall include, but not be limited to, the following:  (i) performance of a Dramatico-Musical Work (*see definitions below*) in its entirety; (ii) performance of one or more musical compositions from a Dramatico-Musical Work accompanied by dialogue, pantomime, dance, stage action, or visual representation of the work from which the music is taken; (iii) performance of one or more musical compositions as part of a story or plot, whether accompanied or unaccompanied by dialogue, pantomime, dance, stage action, or visual representation; or (iv) performance of a concert version of a Dramatico-Musical Work.

### 3. License Fees and Payments

(a)  In consideration of the license granted herein, LICENSEE agrees to pay ASCAP the applicable license fee set forth in the Rate Schedule and Statement of Operating Policy annexed hereto and made a part hereof.  LICENSEE represents and warrants that the Statement of Operating Policy is true and correct as of the date hereof.

(b)  License fees due under this Agreement shall be paid pursuant to either subparagraph 3(b)(i) or 3(b)(ii).

   (i)  Full Payment.  LICENSEE shall pay the annual license fee for the initial license term upon execution of this Agreement and for subsequent license terms no later than thirty (30) days after the anniversary date of this Agreement.

   (ii)  Installment Payments.  LICENSEE shall pay the annual license fee in quarterly installments of one-quarter (¼) the annual license fee upon execution of this Agreement and thereafter no later than thirty (30) days after the close of each quarterly period.  Notwithstanding the above, if any license fees from any year remain due and owing for a period of more than ninety (90) days, any unpaid portion of LICENSEE's license fees for such year(s) will be immediately due and payable.

(c)  If LICENSEE pays the annual license fee in full in accordance with subparagraph 3(b)(i), LICENSEE shall be entitled to a discount to the applicable license fee for such year as set forth on the Rate Schedule, provided that no license fees remain due and owing under this or any other prior ASCAP license.  LICENSEE will not be eligible for any discount if LICENSEE pays its license fee in installments or pays fees for seasonal or occasional performances.

(d)  LICENSEE agrees to pay ASCAP any applicable charge levied by banks or other financial institutions for each unpaid check, draft or other form of monetary instrument submitted by LICENSEE to ASCAP, but in no event less than $35.

(e)  In the event LICENSEE shall be delinquent in payment of license fees due hereunder by thirty (30) days or more, LICENSEE agrees to pay a finance charge on the license fees due of 1½% per month, or the maximum rate permitted by the law of the state in which the Premises licensed hereunder are located, whichever is less, from the date such license fees became due.

(f)  Governmental Entities (*see definitions below*) may impose special taxes or levies on ASCAP related to the licensing of

EX. 13

1

4

http://www.ascap.com/licensing

**GENERIC LICENSE AGREEMENT – RESTAURANTS, BARS, NIGHTCLUBS AND SIMILAR ESTABLISHMENTS**

public performances. Accordingly, in the event that LICENSEE's payment of fees under this Agreement causes ASCAP to incur a liability to pay a gross receipts, sales, use, business use, or other tax which is based on the amount of ASCAP's receipts from LICENSEE, the number of licensees of ASCAP, or any similar measure of ASCAP's activities, then LICENSEE agrees to pay to ASCAP the full amount of such tax, provided that (i) ASCAP has taken reasonable steps to be exempted or excused from paying such tax; and (ii) ASCAP is permitted by law to pass through such tax to its licensees.

**4. Changes in LICENSEE's Operating Policy**

(a) LICENSEE agrees to give ASCAP notice of any change in LICENSEE's Operating Policy (*see definitions below*) and shall, at such time, furnish to ASCAP a current Rate Schedule and Statement of Operating Policy and shall certify that it is true and correct. For purposes of this Agreement, a change in LICENSEE's Operating Policy shall be one in effect for at least thirty (30) days.

(b) Upon any change in LICENSEE's Operating Policy resulting in an increase in the applicable license fee, LICENSEE agrees to pay ASCAP the increased license fee, effective as of the initial date of such change, whether or not written notice of such change has been given pursuant to subparagraph 4(a) hereof.

(c) Upon any change in LICENSEE's Operating Policy resulting in a reduction in the applicable license fee, LICENSEE shall be entitled to the reduction, effective as of the initial date of such change, and to a *pro rata* credit for any unearned license fees paid in advance, provided LICENSEE has given ASCAP written notice of such change. If LICENSEE fails to give ASCAP such written notice within thirty (30) days of such change, any reduction and credit shall be effective thirty (30) days after LICENSEE gives ASCAP written notice of the change. ASCAP reserves the right to verify the basis for any reduction and/or credit and may reject or reverse any such reduction and/or credit if no basis for such reduction and/or credit exists.

(d) If LICENSEE discontinues the performance of music at the Premises, LICENSEE or ASCAP may terminate this Agreement upon thirty (30) days notice, the termination to be effective at the end of the thirty (30) day period. In the event of such termination, ASCAP shall refund to LICENSEE a *pro rata* share of any unearned license fees paid in advance. For purposes of this Agreement, a discontinuance of music shall be one in effect for at least thirty (30) days.

**5. Breach or Default**

Upon any breach or default by LICENSEE of any term or condition herein contained, ASCAP may terminate this license by giving LICENSEE thirty (30) days notice to cure the breach or default, and in the event that it has not been cured within the thirty (30) day

period, this license shall terminate on the expiration of that period without further notice from ASCAP to LICENSEE.

**6. Interference in ASCAP's Operations**

Governmental Entities from time to time may enact laws that create obstacles to ASCAP's licensing of public performances. Accordingly, in the event of either (a) any major interference with the operations of ASCAP in the Governmental Entity in which LICENSEE is located, by reason of any law of such Governmental Entity; or (b) any substantial increase in the cost to ASCAP of operating in such Governmental Entity, by reason of any law of such Governmental Entity, which is applicable to the licensing of performing rights, ASCAP shall have the right to terminate this Agreement immediately and shall refund to LICENSEE any unearned license fees paid in advance.

**7. Notices**

Notices of termination under this Agreement shall be given only if mailed to the other party by registered or certified U.S. Mail or sent by generally recognized same-day or overnight delivery service. Unless stated otherwise, all other notices required or permitted to be given by either party to the other hereunder shall, in addition to the methods set forth above, also be given if sent by first class U.S. Mail, facsimile or electronic mail (e-mail) transmission. Notices to ASCAP shall be sent to the attention of VP of General Licensing as follows: (a) if by U.S. Mail, to the ASCAP address set out above; (b) if by facsimile, to 615-691-7795; and (c) if by electronic mail, to glcs@ascap.com. Notices to LICENSEE shall be sent to the mailing address, facsimile number or electronic mail address set out above. Each party agrees to inform the other of any change of address and/or contact information.

**8. Definitions.**

(a) "ASCAP Repertory" shall mean musical works for which ASCAP has the right to license public performances now or hereafter during the term of this Agreement. All compositions written and copyrighted by ASCAP members and in the repertory on the date this Agreement is executed are included for the full term of this Agreement. Compositions written or copyrighted by ASCAP members during the license term are included for the full balance of the term.

(b) "Dramatico-Musical Work" shall mean a work such as, but not limited to, a musical comedy, opera, play with music, revue, or ballet.

(c) "Governmental Entities" shall mean states, territories, dependencies, possessions or political subdivisions.

(d) "Operating Policy" shall mean all of the factors that determine the total license fee applicable to the Premises under the Rate Schedule.

(e) "Outside Ticket Services" shall mean third-party services distributing tickets to the public for events at the Premises, such as, but not limited to, Ticketmaster, Ticketweb and Ticketron.

IN WITNESS WHEREOF, this Agreement has been duly executed by ASCAP and LICENSEE, this _____ day of _____, 20__.

| AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS | LICENSEE _____ |
|---|---|
| By: _____ | By: _____ |
| NAME: _____ | NAME: _____ |
| TITLE: _____ | TITLE: _____ |

(For 'Title', fill in capacity in which signed: (a) If corporation, state corporate office held; (b) If partnership, write word "partner"; (c) If individual owner, write "individual owner.

Ex. 13

5

### ASCAP 2010 Radio Station License Agreement

AGREEMENT made between American Society of Composers, Authors and Publishers ("ASCAP"), located at One Lincoln Plaza, New York, New York 10023 and

_____ for Radio Station
*(Legal Name of LICENSEE)*

Call Letters
and Band _____ Frequency _____ FCC ID _____   FCC Community
of License   _____
                                                                              (city)                        (state)

**Please Check Appropriate Box and Complete**

☐ A corporation organized under the laws of the State
of _____

☐ A limited liability company organized under the laws of the
State of _____

☐ A partnership consisting
of _____

☐ An individual residing at _____

_____

("LICENSEE", "you", "your") of the Radio Broadcasting station ("Station") currently receiving mail at:

_____
*(Street Address or P.O. Box)*

_____
(City)                              (State)         (Zip Code)                          (Telephone Number)

Location of Station:  ☐  Check box if same as above.

_____
*(Street Address or P.O. Box)*

_____
(City)                              (State)         (Zip Code)

Telephone
number: _____   Fax number: _____

Email address: _____

with the Radio Station Web Site URL:
http:// _____

**1.      Term.**

The term of this Agreement commences as of January 1, 2010, and ends on December 31, 2016, unless earlier terminated as hereinafter provided.

**2.      Definitions.**

A.      "ASCAP Repertory" means musical works for which ASCAP has the right to license for public performance now or hereafter during the term of this Agreement.   All compositions written and copyrighted by ASCAP members and in the repertory on the date this Agreement is executed are included for the full term of this Agreement.   Compositions written or copyrighted by ASCAP members during the license term are included for the full balance of the term.

B.      "Background Music For An Announcement" means mood, atmosphere or thematic music performed as background to an otherwise non-musical commercial, public service or station promotional announcement not exceeding sixty (60) seconds in length.

C.      "Feature Performance" means any performance that is either a principal focus of audience attention, such as a song or other musical composition, whether performed "live" or by means of a recording, or other feature musical subject matter on a radio

Ex. 13

program that is <u>not</u> a performance as a theme or signature, bridge, cue or background music, Jingle, or in conjunction with an advertising, promotional, or public service announcement or logo.

D.     "Gross Revenue from Radio Broadcasting" means all:

    (1)     cash payments for Station's Radio Broadcasting (as defined below) operations made by or on behalf of:

        (a)     Advertisers, sponsors, donors, Local Managers (as defined below) or any other party for the use of the facilities of the Station,

        (b)     sponsors of, or donors to, your Simulcast Programs (as defined below), and

        (c)     sponsors of, or donors to, your Occasional Network Programs (as defined below), and

        (d)     any of the above received by any Local Manager (as defined below) and

    (2)     Net Promotional Revenue (as defined below).

Such payments include all payments made to you, your employees, representatives, agents or any other person acting on your behalf, including time brokers.   Such payments shall not include payments made to independent third parties, such as networks or program suppliers, or non-cash payments such as payments in goods or services commonly referred to as "trades" or "barter."

E.     "Gross Revenue from New Media Transmissions" means all cash payments made by or on behalf of advertisers, sponsors, donors, subscribers, or any other party, in connection with "New Media Transmissions" (as defined below).   Such payments include all payments made to you, your employees, representatives, agents, or any other person acting on your behalf.   Such payments shall not include payments made to independent third parties, such as networks or program suppliers, or non-cash payments such as payments in goods or services commonly referred to as "trades" or "barter."

F.     "Incidental Use" means any use of music other than a Feature Performance, including music used as a theme or signature; bridge, cue or background music; Background Music For An Announcement; a Jingle; public domain music in arrangements controlled by ASCAP on which ASCAP pays no royalties; and music which is used only incidentally to the broadcast of a news event or sports event.

G.     "Jingle" means a commercial, promotional or public service announcement containing musical material (with or without lyrics) originally written for commercial, promotional, or public service announcements, or a musical work originally written for other purposes with the lyrics changed for commercial, promotional, or public service announcement purposes, not exceeding sixty (60) seconds in length and used with the permission of the ASCAP writer or publisher member in interest.

H.     "Local Manager" means any entity not under common ownership or control of LICENSEE that is authorized to resell 10% or more of Station's air time and (1) simulcasts or sells announcements on Station in combination with a radio station owned or operated by the entity, which station has entered into an ASCAP Radio Station License Agreement; or (2) has assumed, contractually or otherwise, responsibility for the management of Station and the payment of license fees.

I.     "Music-Format Station" is any station that has Feature Performances of music in the ASCAP Repertory in more than 90 of its "Weighted Program Periods" (as defined below) in any given week on its terrestrial analog signal.

J.     "Net Promotional Revenue" means all cash payments that you receive from third parties for the direct or indirect promotion of their businesses via the broadcast facilities of the station other than paid programs or commercial announcements (such as, but not limited to, bridal or craft shows, direct mailings, special sponsored events, or publications produced and promoted by the station), less those out-of-the-ordinary costs, such as booth rentals, printing and mailing expenses, and cost of goods sold, that would not have otherwise been incurred without the promotional activity.   Deductible costs may not exceed the cash payments received.

K.     "New Media Transmissions" include any performances transmitted via the Internet, wireless data networks, or any other similar transmission facilities.

L.     "Non-Music-Format Station" is any station that has Feature Performances of music in the ASCAP Repertory in 90 or fewer of its "Weighted Program Periods" (as defined below) in any given week on its terrestrial analog signal.

M.     "Occasional Network Programs" means all programs that you cause to be broadcast simultaneously or by so-called "delayed" or "repeat" broadcasts on any group of two or more radio stations that are affiliated with you for the purpose of broadcasting those programs.   For the purposes of this Agreement, any sports network that you operate is deemed to be an occasional network.

N.     "Program Period" means a fifteen (15) -minute period of Radio Broadcasting (as defined below) commencing on the hour and at fifteen (15), thirty (30), and forty-five (45) minutes past the hour without regard to whether such period contains one or more programs or announcements.

Ex. 13

O.      "Radio Broadcasting" means audio "over-the-air" broadcasts by means of Station's FCC-licensed terrestrial analog signals and HD/multicasting of its FCC-assigned digital facilities (sometimes referred to as "multicasting" or "HD Radio") as identified with the FCC's unique station identifier or FCC Facility ID.   Radio Broadcasting excludes FCC-licensed low power audio broadcasting, with similar technical characteristics and requirements as currently defined in 47 C.F.R. § 73.801, et seq., but it includes FM Translators as defined in 47 C.F.R. § 74.1231.

P.      "Revenue Subject to Fee from Radio Broadcasting" means "Gross Revenues from Radio Broadcasting" less a 12% deduction.

Q.      "Revenue Subject to Fee from New Media Transmissions" means Gross Revenue from New Media Transmissions less a 25% deduction, unless such deduction is modified pursuant to Paragraph 7 of the agreement between ASCAP and the Radio Music License Committee ("RMLC") that is attached as Exhibit A to this Agreement ("ASCAP/RMLC Agreement"), the terms of which are incorporated herein by reference.

R.      "Simulcast Programs" means all programs broadcast simultaneously or by so-called "delayed" or "repeat" broadcasts by two or more radio stations that you own or for which you act as a time broker.

S.      "Through-to-the-Audience License" means, in reference to the scope of the rights granted under this Agreement, a license that authorizes the transmission and retransmission of any Radio Broadcast or New Media Transmission to subscribers, listeners or viewers by whatever means so long as each entity involved in the transmission or retransmission other than LICENSEE has an economic relationship to LICENSEE within the meaning of Section II.S of the Second Amended Final Judgment entered in *United States v. ASCAP* ("AFJ2").   For the avoidance of doubt, nothing in this license shall be construed as authorizing LICENSEE to grant to bars, restaurants, taverns, hotels, retail establishments, and other similar businesses or establishments, any right to perform publicly any of the musical compositions licensed under this Agreement.

T.      "U.S. Territory" means the United States, its commonwealths, territories and possessions, including Puerto Rico.

U.      "Weighted Program Period" means a Program Period multiplied by the following weights:

|  | Time Period | Applicable Weight |
|---|---|---|
|  |  |  |
| Weekdays: | Midnight to 6:00 a.m. | 0.25 |
|  | 6:00 a.m. to 10:00 a.m. | 1.00 |
|  | 10:00 a.m. to 3:00 p.m. | 0.50 |
|  | 3:00 p.m. to 7:00 p.m. | 0.75 |
|  | 7:00 p.m. to Midnight | 0.50 |
|  |  |  |
| Weekends | All day Saturday and Sunday | 0.25 |

**3.      ASCAP Grant of Rights and Limitations.**

A.      ASCAP grants LICENSEE a non-exclusive Through-to-the-Audience License to perform publicly in the U.S. Territory, by Radio Broadcasting or New Media Transmissions, non-dramatic performances of all musical works in the ASCAP Repertory during the Term.

B.      This Agreement does not license the performance of any dramatico-musical works, such as operas, operettas, musical comedies or plays, in whole or in part, or grant LICENSEE any other rights in the musical compositions licensed under this Agreement.

C.      The performances licensed hereunder may originate at any place, whether or not such place is licensed to perform publicly the musical works licensed hereunder, and regardless of the manner, means or methods of such origination.   Except as provided in Paragraph 3.A above, nothing in this Agreement shall be deemed to authorize LICENSEE to grant to others any performance or other rights in any of the musical compositions licensed under this Agreement or to extend to the receiver of LICENSEE's Radio Station Signal or to any place at which the performances licensed by this Agreement originate if other than at Station and for which a separate license for such performances is required.

**4.      License Fee; Minimum Fee; Taxes.**

A.      For all periods through December 31, 2011, if Station was licensed under the terms of the 2004 Radio Station License Agreement or the ASCAP 2010 Radio Station Interim License Agreement, the license fees due and payable, and all the additional terms and conditions that shall be applicable hereunder for such periods, shall be as provided in the ASCAP/RMLC Agreement.

B.      If you elect to pay a license fee on the blanket basis for your Radio Broadcasting, subject to the election provisions of Paragraphs 6.A and 6.B below, you agree to pay us a license fee of 1.7% of your Revenue Subject to Fee from Radio Broadcasting for each year 2012 through 2016 of the Agreement.

Ex. 13

3

8

C.      If your terrestrial analog signal broadcast has 90 or fewer Weighted Program Periods per week that contain at least one Feature Performance of music in the ASCAP Repertory, you may elect to pay a license fee on the program-period basis for your Radio Broadcasting, subject to the election provisions of Paragraphs 6.A and 6.B below, and you agree to pay us the following license fee for each year 2012 through 2016 of the Agreement:

(1)      a base fee of 0.2958% of Revenue Subject to Fee from Radio Broadcasting, plus

(2)      a supplemental fee, calculated based upon the number of Weighted Program Periods in your terrestrial analog signal broadcast per week containing at least one Feature Performance of music in the ASCAP Repertory, as follows:

| Weighted Program Periods Per Week with Feature Performances of music in the ASCAP Repertory | Supplemental Fee |
| --- | --- |
|  |  |
| 0 | None ("Base Fee Only") |
| 1–4 | 9% of base fee ("Minimum Supplemental Fee") |
| 5–20 | 45% of base fee ("Median Supplemental Fee") |
| 21–90 | 200% of base fee ("Maximum Supplemental Fee") |
| 91 or more | Blanket basis only |

D.      If your New Media Transmissions are limited to streaming your Radio Broadcasting via the Internet, wireless data networks or any other similar transmission facilities, include your Revenue Subject to Fee from New Media Transmissions with your Revenue Subject to Fee from Radio Broadcasting when calculating your license fee pursuant to either Paragraph 4.B or 4.C above.

E.      If your New Media Transmissions are not limited to streaming your Radio Broadcasting via the Internet, wireless data networks, or any other similar transmission facilities, and if any of your New Media Transmissions contain Feature Performances of music in the ASCAP Repertory, subject to Paragraph 6.C below, you agree to pay us a license fee of 1.7% of your Revenue Subject to Fee from New Media Transmissions for each year 2012 through 2016 of the Agreement.

F.      If your New Media Transmissions are not limited to streaming your Radio Broadcasting via the Internet, wireless data networks, or any other similar transmission facilities, and if all of your New Media Transmissions contain no Feature Performances of music in the ASCAP Repertory, subject to Paragraph 6.C below, you agree to pay us a license fee of 0.2958% of your Revenue Subject to Fee from New Media Transmissions for each year 2012 through 2016 of the Agreement.

G.      Minimum Fee.   In no event shall your total annual license fee be less than $588.

H.      Annual Reports.   You will submit a report of the license fee due for each year 2012 through 2016 of this Agreement, by April 1st of the following year, by fully completing the Statement of Account that will be made available on ASCAP's website.   For the avoidance of any doubt, all Annual Reports must be submitted using the electronic format and Internet-based delivery transmission methodology to be developed by ASCAP and agreed to by the RMLC, and any Annual Report attempted to be submitted to ASCAP by LICENSEE in any other fashion will be deemed as the non-submission of an Annual Report, subject to the provisions of Paragraph 4.I. ASCAP will promptly confirm electronically to Licensee receipt of the Annual Reports required by this Paragraph.

I.      Monthly Payments in 2012-2016.   For each month in 2012, you will pay us on or before the last day of the month for that month an "on-account" payment equal to 70.9% (representing a reduction in the estimated fee based on projected total industry fees for 2012 of $150 million and (ii) a pro rata share of the annual $15 million refund as provided in the ASCAP/RMLC Agreement) of your monthly fee for 2011.   For each month in calendar years 2013 through 2016, you will pay us on or before the last day of the month for that month a sum equal to 1/12th of the license fee for the preceding calendar year (annualized for any reported period less than a year), adjusted in accordance with any change in the Consumer Price Index (National, all items) between the preceding October and the next preceding October; however, for purposes of completion of Annual Reports (as described above) in any given year this change shall not be less than zero.   If we do not receive the report required by Paragraph 4.H for any calendar year when due, the on-account monthly payments will be in the amount of the monthly payments due for the preceding year plus 24%, and payments at that rate will continue until the required report is received.   If the Station commenced broadcasting after January 1, 2012, you will furnish us with a good-faith estimate of your Revenue Subject to Fee from Radio Broadcasting and your Revenue Subject to Fee from New Media Transmissions for the first year of operation, and the on-account monthly payments during the first calendar year of broadcasting will be 1/12th of the fee provided in Paragraphs 4.B through 4.F for a station having such revenue, however in no case shall the fee for such Station be less than the pro-rated minimum fee provided for in Paragraph 4.G above.   ASCAP will promptly confirm to Licensee receipt of the Monthly Payments required by this Paragraph.

J.      Billing or Accrual Basis.   License fee reports will be made on a billing or accrual basis by all stations, except that any station may report on a cash basis if its books have been kept on a cash basis, in which case LICENSEE shall not be entitled to the deduction provided for in Paragraph 2.P of this Agreement and Licensee shall be entitled to one-half of the deduction provided for in Paragraph 2.Q of this Agreement.

K.      Combination Sales.   If the use of the broadcasting facilities of the station is sold in combination with any other stations that you own, operate or control that are licensed by us under this Agreement, the combination revenue shall be allocated among

the stations on a reasonable basis taking into account factors such as, but not limited to, separate sales by the stations for comparable facilities during the report period or the immediately preceding period, and the relative ratings of the stations during the report period.

L.     Annual Adjustments.   If the monthly payments you have made to us for a year pursuant to Paragraph 4.I are less than the license fee for that year, we will invoice the additional amount due in the month following receipt of the report.   If the amount that you paid for that year exceeds the license fee due for the year, we will apply the excess payment against your future monthly payments, or will refund it to you upon your written request if it is greater than four monthly payments required by Paragraph 4.I above.

M.     Late Payments.   Subject to the separate provisions of Paragraph 5 below that govern the conduct of audits and resolution of audit disputes, if we do not receive any payment required by this Agreement when such payment was due, ASCAP will assess a finance charge of 1.0% per month from the date the payment was due, and ASCAP may further assess LICENSEE for the full amount of out-of-pocket costs incurred by ASCAP in connection with collecting such amounts.

N.     Taxes.   In the event the payment of any license fee to ASCAP by LICENSEE pursuant to this Agreement causes ASCAP to become liable to pay any state or local tax that is based upon the license fees invoiced by ASCAP to licensees (excluding taxes which may be computed based upon income), LICENSEE agrees to pay ASCAP the full amount of such tax together with LICENSEE's fee payment(s) as invoiced by ASCAP within normal payment terms; provided, however, that ASCAP is permitted by law to pass through such tax to LICENSEE; and provided further that LICENSEE, and ASCAP will cooperate in making reasonable efforts to be exempt or excused from the tax.

**5.     Audits.**

A.     Right to Audit.   We have the right by our duly authorized representatives, at any time during customary business hours, upon reasonable notice, to examine your books and records of account only to the extent necessary to verify any report required by this Agreement, for a period of no more than three (3) calendar years prior to the year in which the audit is requested.   We will consider all data and information coming to our attention as a result of any such examination of books and records as confidential pursuant to Paragraph 12 below.

B.     Audit Finance Charges.   If our audit discloses that you underpaid license fees due us:

(1)     You will pay a finance charge on the additional license fees of 1.0% per month from the date(s) the fees should have been paid pursuant to this Agreement if the underpayment is 5% or more but not less than $1,000.

(2)     You will pay a finance charge on the additional license fees of 1.0% per month beginning thirty (30) days after the date we bill the additional license fees to you if the underpayment is less than 5% or less than $1000.

(3)     You may dispute all or part of our audit claim.   If you do, you must, within thirty (30) days from the date that we bill the additional fees, (i) advise us, in writing, of the basis for your dispute and (ii) pay us any fees indisputably owed together with any applicable finance charges.   If there is a good-faith dispute between us with respect to all or part of the additional fees that we have billed pursuant to this Paragraph, no finance charges will be billed with respect to the disputed fees for a period beginning on the date we billed the fees to you and ending sixty (60) days from the date that we respond to your written notification of the existence of a dispute.

(4)     Finance charges computed in accordance with this Paragraph and pertaining to additional fees that you dispute in accordance with subparagraph (3) above will be adjusted pro-rata to the amount arrived at by you and us in resolution of the dispute.

C.     Correction of Errors.   You may correct computational errors on the Annual Reports required by Paragraph 4.H for the calendar year preceding the year in which the corrected report is submitted without incurring any penalty, provided that the corrected report is submitted to ASCAP within ninety (90) days after the Annual Report was originally due under Paragraph 4.H.

**6.     Blanket/Program Period and Ownership Changes.**

A.     If LICENSEE has elected to pay license fees for Radio Broadcasting on the blanket basis, LICENSEE may, as of the first day of January, April, July, or October during any calendar year commencing January 1, 2012, upon not less than forty-five (45) days' prior written notice to both ASCAP and the RMLC using the form attached as Exhibit B, elect to pay license fees on the program-period basis, provided that the Station has changed from a Music-Format Station to a Non-Music-Format Station and LICENSEE is current in all fees and reports required hereunder as of the effective date of LICENSEE's election.   ASCAP and the RMLC will promptly confirm to LICENSEE receipt of the form required by this Paragraph.

B.     If LICENSEE has elected to pay license fees for Radio Broadcasting on the program-period basis, LICENSEE may, as of the first day of January, April, July, or October during any calendar year commencing January 1, 2012, upon not less than forty-five (45) days' prior written notice to both ASCAP and the RMLC, elect to pay license fees on the blanket basis, using the form attached as Exhibit B, provided that the Station has changed from a Non-Music Format Station to a Music-Format Station and LICENSEE is current in all

program-period reports and fees required hereunder as of the effective date of LICENSEE's election.   ASCAP and the RMLC will promptly confirm to LICENSEE receipt of the form required by this Paragraph.

C.       LICENSEE may, as of the first day of January, April, July, or October during any calendar year commencing January 1, 2012, upon not less than forty-five (45) days' prior written notice to both ASCAP and the RMLC, elect to change the basis on which it pays license fees for New Media Transmissions using the form attached as Exhibit B.   LICENSEE's election with respect to New Media Transmissions must comply with the requirements set forth in Paragraphs 4.D, 4.E, and 4.F above.

D.       Upon any filing to the FCC by LICENSEE for any requested change in ownership of Station, based on current FCC Application Forms 314, 315, and 316, LICENSEE shall contemporaneously notify ASCAP of such a request.

E.       Upon any filing to the FCC by LICENSEE for any request to cease Radio Broadcasting, LICENSEE shall contemporaneously notify ASCAP of such a request.

**7.      License Breach.**

In the event LICENSEE shall fail to make payment or submit any report under this Agreement when and as due, ASCAP may give LICENSEE thirty (30) days' notice in writing to cure such breach or default.   In the event the noticed breach or default has not been cured within thirty (30) days of receipt of said notice, ASCAP may promptly terminate this License.

**8.       Indemnification.**

ASCAP will indemnify, save and hold harmless and defend LICENSEE, its advertisers and their advertising agencies, and LICENSEE's and their officers, employees and artists, from and against all claims, demands and suits that may be made or brought against LICENSEE or them with respect to the performance under this Agreement of any compositions in the ASCAP Repertory that are written or copyrighted by ASCAP members.   LICENSEE must give ASCAP immediate notice of any such claim, demand or suit and immediately deliver to ASCAP all papers pertaining thereto.   ASCAP will have full charge of the defense of any such claim, demand or suit, and LICENSEE agrees to cooperate fully with ASCAP in such defense.   LICENSEE may, however, engage its own counsel at its own expense who may participate in the defense of any such action.   At LICENSEE's request, ASCAP will cooperate with and assist LICENSEE, its advertisers and their advertising agencies and LICENSEE's and their officers, employees and artists in the defense of any action or proceeding brought against them or any of them with respect to the performance of any musical compositions contained in the ASCAP Repertory, but not copyrighted or written by members of ASCAP.   This Paragraph 8 does not apply to performances of any works that may be restricted under Paragraph 13 of this Agreement.

**9.       Local Management Agreement.**

A.       In the event LICENSEE enters into an agreement with a Local Manager (a "Local Management Agreement") within thirty (30) days of such agreement (1) LICENSEE shall provide ASCAP with a copy of such agreement, and (2) Local Manager shall execute this Agreement in the signature space provided below.   By signing this Agreement, Local Manager becomes a party to this License Agreement and shall assume, with LICENSEE, all of the rights and obligations set forth in this Agreement for the full period the Local Management Agreement is in effect.

B.       In the event LICENSEE becomes a Local Manager by entering into a Local Management Agreement with another station, LICENSEE shall notify ASCAP within thirty (30) days of entering into the agreement.

C.       In the event that LICENSEE and/or Local Manager do not provide to ASCAP, within sixty (60) days of entering into a Local Management Agreement, the documentation required by Paragraph 9.A, LICENSEE shall remain responsible for timely submitting Annual Reports as required by Paragraph 4.H and shall be obligated to pay 110% of the otherwise applicable blanket or program-period license fees for the entire period during which the documentation required by Paragraph 9.A is overdue.

D.       In the event that LICENSEE and/or Local Manager do not provide ASCAP with the documentation required by Paragraph 9.A within sixty (60) days of entering into a Local Management Agreement, ASCAP shall have the right to terminate this License Agreement upon ten (10) days' written notice.

E.       In the event that the Local Management Agreement provided to ASCAP terminates prior to its stated termination date, LICENSEE and Local Manager shall immediately notify ASCAP of such termination.

**10.       Assignment.**

This Agreement shall enure to the benefit of and shall be binding upon the parties and their respective successors and assigns, but no assignment shall relieve the parties of their respective obligations under this Agreement.

**11.       Music Use Reports.**

A.       All Stations.   Unless ASCAP receives music use data from MediaGuide or a similar service, LICENSEE, upon written request from ASCAP made on not less than one (1) month's notice specifying the period to be covered, agrees to furnish to ASCAP (at

ASCAP's request electronically via a secure web site) a report of LICENSEE's performances by means of Station's Radio Broadcasting and New Media Transmissions of all musical works, indicating the compositions performed by title, artist, or by such other convenient method as may be designated by ASCAP, but such report need not be furnished for more than one (1) week of each calendar year of the term of this Agreement.

B.     Program-Period Stations.

(1)     For the calendar years 2012 though 2016, LICENSEE agrees to furnish to ASCAP on thirty (30) days' written notice a full, true, complete and accurate report, on forms furnished by ASCAP (at ASCAP's request electronically), for one week per calendar quarter ("Quarterly Music Report"), that shall indicate, with respect to all programming during the week, regardless of origin, that has any Feature Performance, the following: (a) the full title of each Feature Performance; (b) the date and time of performance; and (c) the name(s) of the writer(s)/composer(s)/publisher(s), if known, and/or recording artist(s). ASCAP, or a representative of ASCAP, shall advise LICENSEE for which week per quarter this will be done.   The Quarterly Music Report shall be submitted with respect to all Program Periods, even if there was no Feature Performance (in which case only the requested identifying information need be completed along with the statement "No Music Used"), but shall not be required to include the information set forth in this subparagraph for music in programming from a radio network licensed as a network by ASCAP, music in political programming, or music in Program Periods which LICENSEE concedes contain music in the ASCAP Repertory.   Every Program Period that contains a Feature Performance shall be listed on the report, even if the music falls into one of the exempt categories enumerated herein.   In those cases, however, the category of exemption shall be indicated on the report form, listing the name of the network in the case of a network program.   ASCAP will promptly confirm to Licensee receipt of the reports required by this Paragraph.

(2)     Each Quarterly Music Report shall be due to ASCAP on or before 30 days after the week to which the report pertains.   For the calendar years 2012 though 2016, in the event that LICENSEE shall fail to submit any Quarterly Music Report or fail to report performances of musical compositions as required by Paragraph 11.B (l), the following shall apply:

(a)     *First Instance*: ASCAP shall advise LICENSEE in writing of same and will issue LICENSEE a warning.

(b)     *Second and all Subsequent Instances*: ASCAP shall advise LICENSEE in writing of same and LICENSEE shall pay ASCAP $1,000 + 5.75 times the program period fee for each of the three months following the month in which the report was due.

(c)     LICENSEE's failure to report timely or correctly may not be cured by LICENSEE's submission of a late report for said period.

(3)     For any quarter in which LICENSEE furnishes to ASCAP a complete electronic report of its feature Performance of musical works for 24 hours a day, for each day, LICENSEE will not be required to submit Quarterly Music Reports.

**12.     Confidentiality.**

A.     ASCAP shall treat as confidential, and shall not disclose to any third party (other than its employees, directors, officers, survey consultants, attorneys and agents, in their capacity as such, on a need-to-know basis, and other than as set forth in subparagraph B below), any financial or other proprietary documents or information provided to ASCAP by LICENSEE in connection with this Agreement; provided, however, that if ASCAP is served with a subpoena or other legal notice compelling the production of any such proprietary documents or information, ASCAP shall be obligated to give prompt written notice to LICENSEE of such subpoena or other notice.   LICENSEE shall inform ASCAP in writing within seven (7) days of receiving written notification of a subpoena or other legal notice of its intention to object to such production, in which event LICENSEE shall bear the burden of opposing such production.   If the subpoena requires a response or compliance in fewer than fourteen (14) days, ASCAP will inform LICENSEE in writing within three (3) days of receiving the subpoena and LICENSEE must inform ASCAP of its intention to oppose the production no later than five (5) days before compliance is called for.

B.     ASCAP is hereby authorized to provide to RMLC such of LICENSEE's financial information provided to ASCAP pursuant to this Agreement as RMLC may request in connection with its representation of the radio industry, unless LICENSEE notifies ASCAP in writing to the contrary.   RMLC has agreed to treat as confidential any financial information provided to it by ASCAP pursuant to this Paragraph.

**13.     Right to Restrict.**

A.     ASCAP's members may restrict the Radio Broadcasting of their compositions, up to a maximum of 500 at any given time, only for the purpose of preventing harmful effect upon other interest under the copyrights of such works; provided, however, that (1) limited licenses will be granted upon application to ASCAP entirely free of additional charge if the copyright owners are unable to show reasonable hazards to their major interests likely to result from such Radio Broadcasting; (2) the right to restrict any composition will not be exercised for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of the composition; (3) in no case will any charges, "free plugs," or other consideration be required for permission to perform a restricted composition; and (4) in no event

Ex. 13

12

will any composition be restricted after its initial radio broadcast for the purpose of confining further radio broadcasts to a particular artist, station, network or program.

B.      ASCAP may also in good faith restrict the Radio Broadcasting of any composition, over and above the number specified in the preceding subparagraph, only as to which any suit has been brought or threatened on a claim that the composition infringes a composition not contained in the ASCAP Repertory or on a claim that ASCAP does not have the right to license the public performance of the composition by Radio Broadcasting.

**14.    Miscellaneous.**

A.      LICENSEE shall have the right to terminate this license on ten (10) days' written notice in the event of termination, suspension or any substantial alteration or variation of the terms and conditions of the governmental licenses covering the Station or any major interference with the operations of the Station due to governmental measures or restrictions.

B.      ASCAP shall have the right to terminate this license on sixty (60) days' notice if there is any major interference with, or substantial increase in the cost of, our operation as a result of any law of the state, territory, dependency, possession or political subdivision in which the Station is located which is applicable to the licensing of performing rights.

C.      Except as otherwise provided in Paragraphs 4.H, 4.I, 6.A, 6.B, and 6.C above, any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed duly given when sent by ordinary first-class U.S. mail, recognized overnight delivery service, electronic mail or facsimile transmission to the party for whom it is intended, at its address stated above or any other address that either party hereto may from time to time designate for such purpose.   When such notice is mailed or otherwise transmitted, it shall be deemed given upon such mailing or transmission.   Any such notice sent to ASCAP shall be to the attention of the Broadcast Licensing Department – Radio Licensing.   Any such notice sent to LICENSEE shall be to the attention of the person signing this Agreement on behalf of LICENSEE or to the General Manager or Business Manager of Station.

D.      This Agreement (including documents incorporated by reference) constitutes the entire understanding between the parties and cannot be waived, added to or modified orally.   No waiver, addition or modification shall be valid unless in writing and signed by the parties.   This Agreement, its validity, construction and effect shall be governed by the laws of the State of New York without giving effect to its law of conflict of laws.   The fact that any provisions herein are found to be void or unenforceable by a court of competent jurisdiction shall in no way affect the validity or enforceability of any other provisions.   No waiver by ASCAP of full performance of this Agreement by LICENSEE in any one or more instances shall be deemed a waiver of the right to require full and complete performance of this Agreement thereafter, or of the right to cancel this Agreement in accordance with the terms of this Agreement.

**IN WITNESS WHEREOF**, this Agreement, made at New York, New York, has been duly executed by ASCAP and LICENSEE

on _____.
    *(Month)          (Day)          (Year)*

AMERICAN SOCIETY OF COMPOSERS,
AUTHORS AND PUBLISHERS

LICENSEE

_____
*(Full corporate or other name of station owner)*
By _____

_____        _____
*(Name and Title)*                      *(Name and Title)*

Ex. 13

13



January 24, 2012

Re: <u>ASCAP 2010 Radio Station and Group License Agreements</u>

Dear Mr. LoFrumento:

This letter sets forth the Agreement ("Agreement") reached between the American Society of Composers, Authors and Publishers (ASCAP) and the Radio Music License Committee (RMLC) pertaining to certain provisions of the ASCAP 2010 Radio Station License Agreement (the "Station License") and the ASCAP 2010 Radio Group License Agreement (the "Group License") (together, the "2010 Licenses") covering the period January 1, 2010 through December 31, 2016 (the "License Term"). This Agreement is expressly incorporated in Paragraph 2.Q of the Station License and is binding upon all commercial radio stations that: (i) are applicants in the proceeding captioned *U.S.* v. *Am Soc'y of Composers, Authors and Publishers* (*In re Application of the Cromwell Group, Inc., et al.*) and/or are parties to the 2010 Licenses; (ii) were signatories to letter agreements or license extension agreements extending the 2004 ASCAP Radio Station License Agreement (the "2004 License Agreement") for the interim license term beginning January 1, 2010 (collectively, the "Interim Radio Station Licenses"); or (iii) are otherwise currently paying license fees to ASCAP pursuant to the fees specified in the Interim Radio Station Licenses (collectively, the "Licensees").

The parties agree as follows:

1.   Except as otherwise provided herein, for the period January 1, 2010 through December 31, 2011 (the "Retroactive Period"), the interim license terms and interim license fees billed to and payable by individual radio stations ("Interim Fees") pursuant to the Interim Radio Station Licenses shall be considered final terms and license fees. ASCAP's right to collect unpaid license fees shall in no way be prejudiced by this paragraph. The Interim Radio Station Licenses are incorporated herein by reference for all Licensees whose licenses commenced prior to their execution of the 2010 Licenses. The Interim Radio Station Licenses are available at www.ASCAP.com/licensing/radio and at www.radiomlc.com.

2.   For the Retroactive Period, the total fees paid by RMLC stations and by other stations that are bound to the 2004 License Agreement and the Station License will be reduced by $75 million. The parties have agreed upon an allocation methodology whereby:

    a.  the $75 million fee reduction will be applied in the amount of $15 million per annum for each of the years 2012 through 2016 (the "Prospective Period"), to be applied against the otherwise applicable blanket and program-period fees payable by the categories of Licensees described in subsection (b) below.

    b.  the annual $15 million reductions will be allocated as follows:

        i.  For each of the years 2012 and 2013, each Licensee[1] that paid interim license fees in full to ASCAP during the Retroactive Period[2] will receive its pro-rata share of the annual $15 million reduction in accordance with the following formula:

                Station Share of Annual Reduction = (Station Combined 2010-2011 Interim Fees *divided by* Combined 2010-2011 Interim Fees for All Stations) *multiplied by* $15 million

        ii.  For the years 2014-2016, Licensees eligible for a share of the remaining annual $15 million reductions will be those that paid ASCAP either combined 2010-2011 interim blanket license fees in excess of 1.7% of revenue subject to fee (as defined in the 2010 Radio Station License Agreement) or combined 2010-2011 interim program-period[3] base license fees in excess of 0.2958% of revenue subject to fee.[4]  Such calculations shall be made using as a proxy for its 2010-2011 revenue each Licensee's 2012 revenues, which are to be reported to ASCAP by April 1, 2013 in order for a station to be eligible for a reduction.  For purposes of determining eligibility for the 2014-2016 fee reductions, Licensees will be given a 45-day grace period for reporting their 2012 revenues.

---

[1]  For these purposes, the term "Licensee" shall include entitled legal successors to licensees holding ASCAP licenses during the 2010-2011 period.

[2]  Licensees that owe past due fees for the 2010-2011 period in excess of their allocated pro rata share for 2012 of the annual $15 million reduction will not be entitled to that pro rata share until they pay their past due fees for the 2010-11 period.  For each subsequent year of the Prospective Period, Licensees that owe past due fees in excess of their allocated pro rata share of the annual $15 million reduction will not be entitled to that pro rata share until they pay their past due fees.

[3]  For purposes of this Agreement, the term "program-period" is used interchangeably with the term "per-program."

[4]  Stations that switched license types during the Retroactive Period are eligible to receive a share of the 2014-2016 fee reductions so long as the combination of the station's blanket and per-program base fees for the Retroactive Period is greater than it would have been had the 1.7%/0.2958% rates been in effect.

Ex. 13

Each such Licensee's annual share of the reduction will be determined by the following formula:

Station Share of Annual Reduction = (Amount of Station "Overpayment" in Relation to Applicable 1.7%/0.2958% Benchmark *divided by* Total "Overpayments" by All Entitled Stations) *multiplied by* $15 million

3.   For each month in 2012, Licensees will make an "on-account" payment equal to 78.8% of their monthly fee for 2011.  In addition, Licensee will receive a credit for their pro rata share of the $15 million fee reduction as set forth in Paragraph 2 hereof.  Final fees owing for 2012 will subsequently be calculated, and upward or downward adjustments to 2012 fees shall be made, in accordance with the terms of the 2010 Licenses.

4.   For the License Term, there will be no credit against blanket license fees to account for otherwise-licensed ASCAP music.

5.   For avoidance of doubt, the parties intend that the Group License cover only those New Media Transmissions (as defined in the Station License) made by a radio station owner that are not otherwise licensed under the Station License.  By way of example, the Group License is applicable to Clear Channel's iHeartRadio transmissions that do not originate with a terrestrial radio station.  The Group License is not to be used by radio station owners for the purpose of aggregating reporting to ASCAP for multiple terrestrial radio stations.

6.   If, as of January 1, 2015, there is reliable public information showing that industry-wide HD/multicasting revenues account for at least 25% of total industry-wide revenues, then each HD/multicasting channel shall be treated separately from the Station's terrestrial broadcast for purposes of determining whether fees should be paid on a program-period or blanket basis (pursuant to Paragraphs 4.B and 4.C of the Station License).

7.   The deductions taken from Gross Revenues over the Prospective Period by all Licensees will be compared to what the deductions would have been had the 12% deduction rate been applied to all Gross Revenues (not just to Gross Revenues from Radio Broadcasting).  If the comparison over the entire Prospective Period yields a difference of greater than $5 million in license fees, ASCAP will be entitled to a refund of the dollars in excess of the $5 million cap.

a.   In each year, as part of the Annual Adjustment process pursuant to Paragraph 4.L of the 2010 Licenses, ASCAP will make the comparison described above and will notify the RMLC of the results.  If the $5 million cap has been exceeded, ASCAP shall be entitled to recoup the excess by imposing a fee on those Licensees who claimed a 25% standard deduction for Internet, wireless, or other "new media" uses, which fee shall be

Ex. 13

calculated by allocating the total amount in excess of $5 million among those Licensees on a pro rata basis in accordance with each Licensee's total license fees paid during the Prospective Period for New Media Transmissions and Radio Group Transmissions.

b.   In the event that the $5 million cap has been exceeded, ASCAP will notify Licensees that the deduction applicable to Gross Revenues from all activities covered by the 2010 Licenses will be 12% for the remainder of the License Term.

c.   In the event that ASCAP determines that the $5 million cap has been exceeded, the RMLC will have the right to review ASCAP's calculations to verify that the $5 million cap has been exceeded.

8.   ASCAP represents and warrants to the RMLC that: (i) ASCAP has the right, power and authority to grant the rights provided for in the 2010 Licenses and in this Agreement; (ii) there has been no material diminution of the ASCAP Repertory since January 1, 2010; and (iii) if any ASCAP Member (as that term is defined in the ASCAP Articles of Association) has withdrawn from ASCAP the right to license the right of public performance of New Media Transmissions (as that term is defined in the Compendium of ASCAP Rules and Regulations, and Policies Supplemental to the Articles of Association) or withdraws such rights during the License Term, such withdrawal of licensing rights from ASCAP has not precluded, and will not preclude, ASCAP from granting a through-to-the-audience license to perform any or all of the copyrighted musical works in the ASCAP repertory of that ASCAP Member to the RMLC stations pursuant to this Agreement for the duration of the License Term.

9.   In the event that ASCAP shall obtain the right to license performances of works in the ASCAP Repertory by means of New Media Transmissions (as that term is used in the 2010 Licenses) beyond the U.S. Territory during the term of the 2010 Licenses, Paragraph 3.A of the 2010 Licenses shall be deemed amended so as to include such performances within the scope of rights granted by the License for the duration of the term of the License.

10. If, during the term of the Licenses, any dispute arises between ASCAP and any Licensee concerning the interpretation of any of the provisions of this letter agreement or the Licenses which, in the judgment of ASCAP and/or the RMLC, has or may have industry-wide impact, ASCAP and the RMLC shall first endeavor to resolve such dispute, failing which either ASCAP or the RMLC may refer the matter to the judge with supervisory authority over the ASCAP Consent Decree.  In the event of such a reference, either ASCAP or the RMLC, as a preliminary matter, shall be entitled to assert that the dispute between them is not properly dealt with under the terms of this provision.

11. ASCAP and the RMLC agree to confer by no later than February 1, 2016 to seek to agree upon final (and, if necessary, interim) license fees for periods subsequent to December 31, 2016.  Nothing herein shall affect the rights of ASCAP, the RMLC, or any Licensees to seek a determination of reasonable fees or the fixing of interim fees for the

Ex. 13

17

period commencing January 1, 2017, pursuant to Section IX of the ASCAP Consent Decree.

    12. ASCAP and the RMLC are entering into this Agreement without prejudice to any arguments or positions they or any Licensee may assert in any future rate proceeding concerning what constitutes reasonable blanket license or program-period license fees and terms for commercial radio stations.

        Please indicate your agreement to the above by signing and dating on the lines provided below.


Very truly yours,


_____
s/Edward Christian
Chairman
Radio Music License Committee


AGREED TO:

AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS

_____
s/John LoFrumento, Chief Executive Officer

Dated:  January 24, 2012_____

Ex. 13

**EXHIBIT B**

ASCAP

## Radio Station Election to Change License Basis Form

Date:_____

Call Letters: ☐ ☐ ☐ ☐   ☐ AM ☐ FM   ASCAP Account Number: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐

Station Frequency:_____ FCC Community of License: City _____ ST _____

Legal Name of Licensee:_____

Group Owner:_____

Previous Program Format:_____

New Program Format:_____ Date of Change:_____

---

Check appropriate box:

☐ Convert to Blanket Basis for Radio Broadcasting (currently licensed on Program Period Basis)

☐ Convert to Program Period Basis for Radio Broadcasting (currently licensed on Blanket Basis)

☐ Convert to Blanket Basis for New Media Transmissions (currently licensed on Program Period Basis)

☐ Convert to Program Period Basis for New Media Transmissions (currently licensed on Blanket Basis)

Effective Date of Conversion*   [ ____ / ____ / ____ ]

\* Please note that you are permitted to convert prospectively your station's license type effective the following Januaiy 1st, April 1st, July 1st or October 1st, whichever is sooner. You are required to make your request in wnting at least forty-five (45) days prior to the effective date of the change. Your station must be current in both reports and payments due ASCAP as required by your license in order to be eligible.

### Complete this section only if you are converting to a Program Period Basis

Contact:_____        Contact Title:_____

Contact Phone #:_____        Contact Fax #:_____

Contact Email Address:_____

*If converting to a Program Period Basis for Radio Broadcastin, please estimate the number of quarter hours feature music is played on an average weekday, Saturday, and Sunday during each of the following time periods:*

Average Weekdays:  12am-6am (max 24) _____        Average Saturday: All Day (max 96) _____

6am-10am (max 16) _____        Average Sunday: All Day (max 96) _____

10am-3pm (max 20) _____

3pm-7pm (max 16) _____

7pm-12mid (max 20) _____

---

_____
Signature

_____
Print Name of Signatory

_____
Print Title of Signatory

Please Fax, Mail or Email to *BOTH ASCAP and the RMLC*

| ASCAP | RMLC |
|---|---|
| One Lincoln Plaza | 1616 Westgate Circle |
| New York, NY 10023 | Brentwood, TN 37027 |
| Attention: Ray Schwind, | Attention: William Velez, |
| *VP Dir. of Broadcast Licensing* | *Executive Director* |
| Fax #: (212) 621-6446 | Fax #: (615) 844-6261 |
| rschwind@ascap.com | bill@radiomlc.org |

Ex. 13

19

15



**LOCAL MANAGER ACKNOWLEDGEMENT OF**
**ASCAP LICENSE AGREEMENT**


        The undersigned LOCAL MANAGER hereby acknowledges and agrees that it has become a party to the foregoing License Agreement and assumes, with LICENSEE, all of the rights and obligations set forth in the foregoing License Agreement for the full period that the LOCAL MANAGER's Local Management Agreement with LICENSEE is in effect.

Dated: _____

                    LOCAL MANAGER:_____

                        By:_____

                        Title:_____


                        Station Call Letters:_____

                        City and State:_____


                        Effective Date of Local Management Agreement:

                        _____


                        Address for Billing and Other Purposes:

                        _____

                        _____

                        _____

Ex. 13

# LICENSE AGREEMENT-COMMON AREAS IN SHOPPING CENTERS AND SHOPPING MALLS

**Agreement** between American Society of Composers, Authors and Publishers ("SOCIETY"), located at

2 Music Square West, Nashville, TN 37203

and _____

("LICENSEE"), located at

_____
_____

as follows:

### 1.   Grant and Term of License

(a) SOCIETY grants and LICENSEE accepts for a term of one year, commencing _____, and continuing thereafter for additional terms of one year each unless terminated by either party as hereinafter provided, a license to perform publicly at common areas in the shopping center or shopping mall known as:

_____ and located at: _____
_____
_____

("the premises"), and not elsewhere, non-dramatic renditions of the separate musical compositions now or hereafter during the term hereof in the repertory of SOCIETY, and of which SOCIETY shall have the right to license such performing rights.

(b) This agreement shall enure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns, but no assignment shall relieve the parties hereto of their respective obligations hereunder as to performances rendered, acts done and obligations incurred prior to the effective date of the assignment.

(c) Either party may, on or before thirty days prior to the end of the initial term or any renewal term, give notice of termination to the other. If such notice is given the agreement shall terminate on the last day of such initial or renewal term.

### 2.   Limitations on License

(a) This license is not assignable or transferable by operation of law or otherwise, except as provided in paragraph "1(b)" hereof, and is limited to LICENSEE and to the premises.

(b) This license does not authorize the broadcasting, telecasting or transmission by wire or otherwise, of renditions of musical compositions in SOCIETY'S repertory to persons outside of the premises.

(c) This license does not authorize any performance by means of a coin-operated phonorecord player (jukebox) otherwise covered by the statutory license provisions of 17 U.S.C. §116.

(d) This license is limited to non-dramatic performances, and does not authorize any dramatic performances. For purposes of this agreement, a dramatic performance shall include, but not be limited to, the following:

   (i)   performance of a "dramatico-musical work" (as hereinafter defined) in its entirety;

  (ii)   performance of one or more musical compositions from a "dramatico-musical work" (as hereinafter defined) accompanied by dialogue, pantomime, dance, stage action, or visual representation of the work from which the music is taken;

 (iii)   performance of one or more musical compositions as part of a story or plot, whether accompanied or unaccompanied by dialogue, pantomime, dance, stage action, or visual representation;

 (iv)   performance of a concert version of a "dramatico-musical work" (as hereinafter defined).

The term "dramatico-musical work" as used in this agreement, shall include, but not be limited to, a musical comedy, opera, play with music, revue, or ballet.

Ex. 13

(e) This license is limited to LICENSEE'S performances at the premises which are given at common areas in LICENSEE'S shopping center or shopping mall, and does not extend to performances in individual establishments, such as stores or restaurants, located in LICENSEE'S shopping center or shopping mall.

### 3.   License Fees, Reports and Payments

(a) In consideration of the license granted herein, LICENSEE agrees to pay SOCIETY the applicable license fee set forth in the rate schedule printed below and made part hereof, on January 15, April 15, July 15 and October 15 of each year for the previous calendar quarter.

(b) LICENSEE shall submit reports to SOCIETY, on forms supplied free of charge by SOCIETY, as specified in the rate schedule printed below and made part hereof.

### 4.   Breach or Default

Upon any breach or default by LICENSEE of any term or condition herein contained, SOCIETY may terminate this license by giving LICENSEE thirty days notice to cure such breach or default, and in the event that such breach or default has not been cured within said thirty days, this license shall terminate on the expiration of such thirty-day period without further notice from SOCIETY. In the event of such termination, SOCIETY shall refund to LICENSEE any unearned license fees paid in advance.

### 5.   Interference in Society's Operations

In the event of:

(a) any major interference with the operations of SOCIETY in the state, territory, dependency, possession or political subdivision in which LICENSEE is located, by reason of any law of such state, territory, dependency, possession or political subdivision; or

(b) any substantial increase in the cost to SOCIETY of operating in such state, territory, dependency, possession or political subdivision, by reason of any law of such state, territory, dependency, possession or political subdivision, which is applicable to the licensing of performing rights,

SOCIETY shall have the right to terminate this agreement forthwith by written notice and shall refund to LICENSEE any unearned license fees paid in advance.

### 6.   Notices

All notices required or permitted hereunder shall be given in writing by certified United States mail sent to either party at the address stated above. Each party agrees to inform the other of any change of address.

IN WITNESS WHEREOF, this Agreement has been duly executed by ASCAP and LICENSEE.
this                        day of                              , 20    .


AMERICAN SOCIETY OF COMPOSERS,           LICENSEE _____
        AUTHORS AND PUBLISHERS
                                         By _____
By _____
                                         TITLE _____

                                         (Fill in capacity in which signed:  (a)  If corporation, state corporate
                                         office held;  (b)  If partnership, write word "partner" under signature
                                         of signing partner;  (c)  If individual owner, write "individual owner"
                                         under signature.)

Ex. 13

22



# SHOPPING CENTERS
## *2014 Rate Schedule*

**I.  PERFORMANCE OF LIVE MUSIC, OR PERFORMANCE OF MECHANICAL MUSIC WITH ACTS**

| SIZE OF SHOPPING CENTER/SHOPPING MALL* | DAILY LICENSE FEE |
|---|---|
| Up to 300,000 Square Feet | $43.00 |
| 300,000 Square Feet to 900,000 Square Feet | $58.00 |
| 900,000 Square Feet and Over | $71.50 |

*Size of shopping center/shopping mall shall include all shopping center or mall areas with the sole exception of parking areas.

### MAXIMUM ANNUAL LICENSE FEE

The maximum annual license fee to be paid under this Rate Schedule I. shall be $3,467.50.

### CHAIN DISCOUNT

LICENSEE shall be entitled to a 20% reduction in the maximum annual license fees under this Rate Schedule I. provided said fees are paid for at least 10 shopping centers or shopping malls operated by LICENSEE.

**II.  PERFORMANCE OF MUSIC BY MECHANICAL MEANS ONLY, WITHOUT ACTS**

A.  Annual license fee for audio-only performances
$232.50 Up to 3 Speakers
$ 47.50 Each Additional Speaker
Maximum License Fee: $1,950.00

B.  Annual license fee for audio-visual performances
$350.50 Up to 3 Speakers
$ 71.00 Each Additional Speaker
Maximum License Fee: $2,943.00

If performances are given by both audio and audio-visual means, the higher license fee shall apply.

### LICENSE FEES FOR CALENDAR YEAR 2015 AND THEREAFTER

The annual rates set forth in this Rate Schedule will apply for the calendar year 2014.  Rates for each subsequent calendar year will be adjusted in accordance with the increase in the Consumer Price Index, All Urban Consumers - (CPI-U) between the preceding October and the next preceding October.

### REPORTS DUE

LICENSEE shall submit reports to SOCIETY as follows:
1.  An annual report, submitted with the January 15 quarterly payment of license fees, for each shopping center/shopping mall for which an annual license fee is paid.
2.  A quarterly report, submitted with each quarterly payment of license fees, for each shopping center/shopping mall for which daily license fees under Rate Schedule I are paid.  Said reports shall include all information necessary for the completion of the appropriate license fees.

Ex. 13



# COMMON AREAS IN INDIVIDUAL SHOPPING CENTERS AND SHOPPING MALLS
### *2014 Report Form*

Account Number: _____     Premise Name: _____

**Report Period:** ☐☐ / ☐☐ / ☐☐☐☐  –  ☐☐ / ☐☐ / ☐☐☐☐

**Section I. LIVE MUSIC PERFORMANCE OR MECHANICAL MUSIC PERFORMANCE WITH ACTS**
If you are reporting live music or mechanical music with acts, complete this section, if not go to Section II.

    **A. Size of Shopping Center/Shopping Mall:** _____ Sq. ft.

    **B. Enter each day(s) qualifying performance(s) as a single line entry\*:**

|    | <u>Date</u> | <u>Name or Description of Performances</u> | Daily ASCAP <u>License Fee\*\*</u> |
|----|------|------|------|
| 1  |      |      |      |
| 2  |      |      |      |
| 3  |      |      |      |
| 4  |      |      |      |
| 5  |      |      |      |
| 6  |      |      |      |
| 7  |      |      |      |
| 8  |      |      |      |
| 9  |      |      |      |
| 10 |      |      |      |

**TOTAL: (Add lines 1 through 10, plus totals from any additional report forms, <u>but not more than</u> $3,467.50)**  $ ☐☐☐☐ . ☐☐

**Section II. MECHANICAL MUSIC PERFORMANCES WITHOUT ACTS**
**Only to be completed during <u>first quarter of each year</u>.**
If you are reporting mechanical music performances without acts, complete this Section.  If not, go to Section III.

**If you use a background music supplier licensed by ASCAP, enter their name and address.**

Company Name: _____     Address: _____

**Do you provide your own mechanical music?** ○ Yes   ○ No   If "yes", complete the following, if "no" go to Section III.

                                             **<u>Annual ASCAP Mech. License Fee\*\*</u>**

**1. Audio Only:    Number of speakers** _____     _____
(Maximum license fee: $1,950.00)

**2. Audio-Visual: Number of speakers** _____     _____
(Maximum license fee: $2,943.00)
           **TOTAL:  (Add lines 1 and 2, <u>but not more than</u> $2,943.00)**  $ ☐☐☐☐ . ☐☐

**Section III. TOTAL LICENSE FEES DUE (Add TOTALS from Sections I. and II.)**  $ ☐☐☐☐☐☐☐☐☐ . ☐☐

If you are reporting more than 10 days, or need additional forms, you may photocopy this form or contact us at 1-800-505-4052.
\*Size of shopping center/shopping mall shall include all shopping center or shopping mall  areas with the sole exception of parking areas.
\*\*In calculating the ASCAP license fee, please refer to the Rate Schedule on the back of this form.

| Contact Person & Title | ☐☐☐☐☐☐☐☐☐☐☐☐☐☐ |
|---|---|

Phone Number: ☐☐☐ – ☐☐☐ – ☐☐☐☐     Ext: ☐☐☐☐     Fax Number: ☐☐☐ – ☐☐☐ – ☐☐☐☐

Email: _____     Website: _____

I certify the above information is true and correct.

Dated: ☐☐ / ☐☐ / ☐☐☐☐          Signature: _____

Ex. 13