1                    UNITED STATES DISTRICT COURT

2

3                  CENTRAL DISTRICT OF CALIFORNIA

4                        WESTERN DIVISION

5

6

7    GOOD MORNING TO YOU          )
     PRODUCTIONS, CORP.,          )
8                                 )
                                  )
9          PLAINTIFF,             )   CV 13-4460-GHK(MRWX)
                                  )
10         V.                     )   LOS ANGELES, CALIFORNIA
                                  )   JULY 25, 2014
11                                )
     WARNER/CHAPPELL MUSIC, INC., )
12                                )   (9:34 A.M. TO 10:56 A.M.)
                                  )
13         DEFENDANT.             )
                                  )
14                                )

15
                                  HEARING
16
                BEFORE THE HONORABLE MICHAEL R. WILNER
17                  UNITED STATES MAGISTRATE JUDGE

18   APPEARANCES:            SEE NEXT PAGE

19   COURT REPORTER:         RECORDED; COURT SMART

20   COURTROOM DEPUTY:       VERONICA MC KAMIE

21   TRANSCRIBER:            DOROTHY BABYKIN
                             COURTHOUSE SERVICES
22                           1218 VALEBROOK PLACE
                             GLENDORA, CALIFORNIA  91740
23                           (626) 963-0566

24
     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

```
 1    APPEARANCES:
      FOR THE PLAINTIFF:         WOLF HALDENSTEIN ADLER
 2                                 FREEMAN & HERZ LLP
                                 BY:   MARK C. RIFKIN
 3                                     ATTORNEY AT LAW
                                 270 MADISON AVENUE
 4                               NEW YORK, NEW YORK  10016

 5                               WOLF HALDENSTEIN ADLER
                                   FREEMAN & HERZ LLP
 6                               BY:  BETSY C. MANIFOLD
                                     ATTORNEY AT LAW
 7                               750 B STREET
                                 SUITE 2770
 8                               SAN DIEGO, CALIFORNIA  92101

 9
      FOR THE DEFENDANT:         MUNGER TOLLES & OLSON LLP
10                               BY:  MELINDA E. LEMOINE
                                     ADAM I. KAPLAN
11                                   ATTORNEYS AT LAW
                                 355 SOUTH GRAND AVENUE
12                               35TH FLOOR
                                 LOS ANGELES, CALIFORNIA  90071
13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                              I N D E X

2    CV 13-4460-GHK(MRWX)                        JULY 25, 2014

3    PROCEEDINGS:   HEARING RE DISCOVERY

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1        LOS ANGELES, CALIFORNIA; FRIDAY, JULY 25, 2014; 9:34 A.M.

2              THE CLERK:  MICHAEL R. WILNER, UNITED STATES

3    MAGISTRATE JUDGE, PRESIDING.

4              THE COURT:  GOOD MORNING, EVERYBODY.

5              THE CLERK:  CV 13-4460-GHK(MRWX), GOOD MORNING TO

6    YOU PRODUCTIONS CORPORATION VERSUS WARNER/CHAPPELL MUSIC,

7    INCORPORATED.

8              COUNSEL, PLEASE STATE YOUR APPEARANCES.

9              MR. RIFKIN:  MARK RIFKIN AND BETSY MANIFOLD FOR THE

10   PLAINTIFFS, YOUR HONOR.

11             THE COURT:  ALL RIGHT.  MR. RIFKIN.

12             MS. LEMOINE:  AND MELINDA LEMOINE AND ADAM KAPLAN

13   FOR DEFENDANT WARNER/CHAPPELL, YOUR HONOR.

14             THE COURT:  AND MR. KAPLAN.

15             ALL RIGHT.  AS I AM OBVIOUSLY GOING TO SAY, GOOD

16   MORNING TO YOU.

17             (LAUGHTER.)

18             MS. LEMOINE:  GOOD MORNING.

19             MR. RIFKIN:  GOOD MORNING.

20             THE COURT:  THAT'S THE JOKE -- THAT'S THE JOKE THAT

21   NEVER STOPS BEING FUNNY.

22             ALL RIGHT.  WE ARE ON FOR A DISCOVERY MOTION IN A

23   COPYRIGHT ACTION INVOLVING THE RIGHTS TO "HAPPY BIRTHDAY TO

24   YOU."

25             I WILL NOTE THAT SEVERAL OF THE EXTERNS WHO ARE

5

1    WORKING FOR ME THIS SUMMER ARE PRESENT IN THE COURTROOM AS IS

2    A REPORTER FROM -- WAS IT LAW 360?

3              THE REPORTER:  THAT'S RIGHT.

4              THE COURT:  YOU'RE WELCOME.

5              AND AS A RESULT WHAT I WANTED TO LET THE PARTIES

6    KNOW IS THAT ALTHOUGH ASPECTS OF YOUR FILINGS WERE PROPERLY

7    FILED UNDER SEAL BECAUSE THERE ARE ATTORNEY-CLIENT PRIVILEGE

8    ISSUES HERE, I THINK THAT WE CAN HAVE OUR DISCUSSION HERE

9    TODAY WITHOUT MAKING SUBSTANTIVE REFERENCE TO PRIVILEGED --

10   OR PUTATIVELY PRIVILEGED DOCUMENTS.  IF WE GET INTO AN AREA

11   WHERE IT SEEMS A LITTLE MORE DODGEY, YOU KNOW, LET ME KNOW

12   AND WE'LL TALK ABOUT IT.  BUT I DON'T SEE ANY REASON THAT WE

13   CAN'T HAVE OUR DISCUSSION HERE TODAY.

14             ALL RIGHT.  SO, I REVIEWED A TREMENDOUS AMOUNT OF

15   MATERIAL OVER THE LAST FEW DAYS.  I'M NOT GOING TO RECITE IT

16   ALL.  I THINK -- I THINK I HAVE A HANDLE ON WHAT WAS FILED.

17   BUT THERE WAS THE JOINT STIPULATION THAT CAME IN A COUPLE OF

18   WEEKS AGO WITH SUPPORTING DOCUMENTATION AND SUPPORTING

19   DECLARATIONS.

20             THERE WAS A SUPPLEMENTAL BRIEF BOTH FROM WARNER AS

21   WELL AS FROM THE PLAINTIFFS WITH SOME ADDITIONAL MATERIALS.

22             I ALSO DID REVIEW, BUT JUST KIND OF LIGHTLY, THE

23   UNDERLYING COUDERT LETTERS THAT WE'RE TALKING ABOUT HERE.  I

24   DON'T FEEL THAT THE SUBSTANCE OF THOSE LETTERS ARE REALLY

25   NECESSARY FOR OUR DISCUSSION PURPOSES HERE, ALTHOUGH THE

6

1   TRANSMITTAL LETTER FROM SUMMY -- AND WE'LL GET TO THAT -- TO

2   ASCAP'S GENERAL COUNSEL MAY BE OF RELEVANCE.  THERE MAY BE A

3   POTENTIAL PRIVILEGE ISSUE THERE, BUT WE CAN SORT OF DANCE

4   AROUND.

5            MR. RIFKIN:  AND, YOUR HONOR, THAT IS THE ONE AREA

6   WHERE I THINK YOUR CAVEAT MAY REQUIRE SOME CLARIFICATION.

7   BECAUSE I DO THINK IT'S --

8            THE COURT:  THAT'S FINE.

9            MR. RIFKIN:  -- IT IS IMPORTANT TO DISCUSS THE

10  SPECIFICS OF THAT LETTER.  SO, EXCEPT FOR THE COVER LETTER,

11  AS YOU NOTED, I AGREE --

12           THE COURT:  OKAY.

13           MR. RIFKIN:  -- WITH YOUR HONOR THAT WE DON'T NEED

14  TO TALK ABOUT THE SUBSTANCE OF THE COUDERT LETTERS, BUT I

15  THINK MRS. SENGSTACK'S LETTER --

16           THE COURT:  YES.

17           MR. RIFKIN:  -- IS DIFFERENT.

18           THE COURT:  I THINK IT IS, AND WE CAN DEFINITELY --

19  WE CAN DEFINITELY GET THAT.

20           I MEAN, YOU KNOW, SORT OF THE HEADLINE I WANTED TO

21  START WITH IS I THOUGHT YOU FOLKS DID A NICE JOB.  I

22  UNDERSTAND SORT OF THE ISSUES GOING ON IN THE LITIGATION,

23  SOME OF THE TIME PRESSURES, EITHER COURT IMPOSED,

24  SELF-IMPOSED, WHATEVER, BUT YOU DID A LOT OF NICE WORK IN A

25  SHORT AMOUNT OF TIME.  AND THAT'S ON BOTH SIDES.  AND I SAY

7

1   THAT NOT ALWAYS SEEING THAT IN FEDERAL COURT.

2           THIS IS A DISCOVERY MOTION.  RULE 37 REQUIRES THE

3   COURT TO AWARD FEES TO THE WINNING PARTY IN DISCOVERY,

4   UNLESS I MAKE AN AFFIRMATIVE FINDING THAT BOTH SIDES -- OR

5   THAT THE LOSING SIDE WAS SUBSTANTIALLY JUSTIFIED IN THE

6   POSITION THAT THEY TOOK.  AND I CAN FRANKLY SAY THAT BOTH

7   SIDES WERE SUBSTANTIALLY JUSTIFIED, AND I DON'T SEE THAT I'M

8   GOING TO BE AWARDING FEES HERE.

9           WHAT I'D LIKE TO DO IS GIVE YOU MY TENTATIVE

10  THOUGHTS.  OKAY.  I'VE GOT YOUR -- I'VE GOT YOUR PAPERS.  I

11  READ THEM.  I SPENT A LOT OF TIME WITH THEM.

12          YOU CAN HAVE A SEAT.

13          MR. RIFKIN:  THANK YOU.

14          MS. LEMOINE:  THANK YOU, YOUR HONOR.

15          THE COURT:  AND WHEN THE TIME COMES TO HEAR FROM

16  YOU YOU CAN GO TO THE LECTERN.

17          AND I HAVE SOME PRETTY STRONG THOUGHTS HERE AS A

18  RESULT OF WHAT YOU PUT IN FRONT OF ME, THE FACTS THAT YOU'VE

19  BEEN ABLE TO DEVELOP, THE LAW THAT YOU HAVE REFERRED ME TO.

20          AND, SO, LET ME GIVE YOU, YOU KNOW, A PRETTY

21  THOUGHT-OUT TENTATIVE.  I'M HAPPY TO HEAR FROM YOU.  IT MAY

22  MAKE SENSE FOR MAYBE US TO TAKE A BREAK SO YOU CAN ORGANIZE

23  YOUR THOUGHTS AND I CAN GET A DRINK OF WATER.

24          BUT I WANT TO DEAL WITH THIS.  I THINK THAT I WILL

25  BE ABLE TO GET A WRITTEN DECISION TO YOU TODAY OR TOMORROW.

8

1          IF THERE IS GOING TO BE A DESIRE TO APPEAL MY

2     DECISION, WE CAN TALK ABOUT THE MECHANICS OF IT.  IF YOU

3     THINK THAT I AM CLEARLY WRONG ON THE FACTS OR THE LAW, OR

4     WHATEVER THE GOVERNING STANDARD IS, YOU ARE ABSOLUTELY

5     ENTITLED TO AND INVITED TO APPEAL THIS MATTER TO CHIEF JUDGE

6     KING WHO IS YOUR DISTRICT JUDGE IN THIS MATTER.

7          YOU WILL BE ABLE TO VERY PROMPTLY GET THIS

8     TRANSCRIPT.  I HOPE I'LL BE ABLE TO GET YOU A WRITTEN

9     DECISION.  HOWEVER, THE REASON I WANTED TO EXPEDITE THIS

10    HEARING, EVEN THOUGH YOU FOLKS HAD ALREADY WANTED TO EXPEDITE

11    IT, BUT EVEN FURTHER BECAUSE I'M OUT OF TOWN BEGINNING THIS

12    WEEKEND AND THEN THROUGH NEXT WEEK.

13         I DON'T WANT MY PERSONAL SCHEDULE TO HANDICAP THE

14    PARTIES IN IMPORTANT LITIGATION.  BUT I THINK YOU'LL HAVE THE

15    ABILITY TO TAKE ME UP -- IF YOU WANT TO.  IF YOU CAN LIVE

16    WITH THIS, YOU CAN LIVE WITH THIS.  I'M NOT DEMANDING YOU

17    APPEAL ME.  I DON'T THINK I EVER DO THAT.  BUT, YOU KNOW, I

18    RECOGNIZE THAT YOU HAVE THE RIGHT TO DO THAT, AND I WANT TO

19    TALK ABOUT THE MECHANICS, IF NECESSARY.  BUT LET'S SEE WHERE

20    WE GO.

21         BUT LET ME GIVE YOU A RECITATION OF WHAT I

22    UNDERSTAND TO BE THE RELEVANT FACTS HERE.  YOU FOLKS SPENT A

23    FAIR AMOUNT OF TIME ON SOME ISSUES THAT I DON'T THINK ARE

24    REALLY, REALLY GERMANE TO THE DISPUTE.  I KNOW THAT LAWYERS

25    IN LITIGATION LIKE TO KNOCK ABOUT HE SAID, SHE SAID, THIS

9

1  HAPPENED, THAT HAPPENED.  THAT'S FANTASTIC.  A LOT OF TIMES

2  FROM THE JUDGE'S PERSPECTIVE IT'S JUST BUZZ, BUZZ, BUZZ.

3         BUT I THINK -- I THINK I WAS ABLE TO PULL OUT THE

4  KEY COMPONENTS OF WHAT'S GOING ON HERE.  AND THIS IS, AS I

5  SAID, A COPYRIGHT CASE INVOLVING THE OWNERSHIP OF A COPYRIGHT

6  OR COPYRIGHTS TO THE "HAPPY BIRTHDAY TO YOU" SONG.

7         AT SOME POINT IN TIME THOSE RIGHTS WERE OWNED BY A

8  COMPANY CALLED SUMMY-BIRCHARD, S-U-M-M-Y, DASH,

9  B-I-R-C-H-A-R-D.  AND THE SUMMY COMPANY, AS I'LL CALL IT, AT

10 SOME POINT IN 1976 AND 1978 RECEIVED COMMUNICATIONS FROM A

11 LAWYER AT COUDERT BROTHERS, C-O-U-D-E-R-T, A NEW YORK CITY

12 LAW FIRM.  AND THOSE ARE THE LETTERS AT EXHIBITS B AND C TO

13 MR. RIFKIN'S DECLARATION.

14         AND I THINK IT'S PRETTY CLEAR THAT THE PARTIES

15 AGREED -- I BELIEVE MS. MANIFOLD ACKNOWLEDGED IN OUR PREVIOUS

16 DISCUSSION -- DON'T WORRY, I'M NOT GOING TO SANDBAG YOU WITH

17 THIS -- BUT THAT WHEN THE COUDERT LAW FIRM PROVIDED

18 INFORMATION TO SUMMY IN CONNECTION WITH THE COPYRIGHT OR

19 COPYRIGHTS AT ISSUE HERE, I DON'T THINK THERE'S ANY DISPUTE

20 THAT THAT COMMUNICATION WAS PROTECTED BY THE ATTORNEY-CLIENT

21 PRIVILEGE.  IT WAS A COMMUNICATION BETWEEN A LAWYER AND A

22 CLIENT IN A PRIVILEGED OR CONFIDENTIAL CONTEXT.  IT RELATED

23 TO LEGAL ADVICE.  AND I THINK AT THE OUTSET WE HAD AN

24 ACKNOWLEDGMENT THAT THE 1976 AND 1978 LETTERS FROM THE LAW

25 FIRM TO SUMMY ARE PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE.

1          MR. RIFKIN IS SORT OF SHAKING HIS HEAD SIDE TO

2     SIDE.  WE'LL COME BACK TO THAT.

3          THERE IS ALSO NO DISPUTE THAT SUMMY SENT THOSE

4     COUDERT LETTERS TO AN INDIVIDUAL WHO I UNDERSTAND TO BE THE

5     GENERAL COUNSEL AT THE TIME OF ASCAP, THE AMERICAN SOCIETY OF

6     -- AND I NEVER GET IT RIGHT -- COMPOSERS AND SOME OTHER

7     PEOPLE.  BUT THE ACRONYM IS ASCAP.  THAT WAS A LETTER SENT IN

8     1979 FROM SUMMY TO ASCAP TRANSMITTING THE COUDERT LETTERS.

9          AND THERE IS A VERY BRIEF COVER LETTER FROM AN

10    EXECUTIVE AT SUMMY BASICALLY EXPLAINING -- AND I DON'T WANT

11    TO CAUSE A PRIVILEGE ISSUE HERE, BUT JUST SAYING, HERE'S

12    MATERIAL HAVING TO DO WITH THE CLAIM OF RIGHTS REGARDING THE

13    SONG.  OKAY.  AND IT DOESN'T SAY TOO MUCH MORE BEYOND THAT AS

14    WE PREVIOUSLY DISCUSSED.  AND THAT'S ABOUT IT.

15         WE GET FAST FORWARDED TO 2014 AND WE GET TO THE

16    ISSUE OF HOW THIS CAME UP.  I KNOW THERE'S A LOT OF

17    PROCEDURAL ISSUES HERE.  I KNOW THE PARTIES WENT BACK AND

18    FORTH ON SOME OF THESE ISSUES.

19         THE PLAINTIFFS SERVED A SUBPOENA ON ASCAP.  ASCAP

20    PRODUCED THE COUDERT LETTERS AND, I PRESUME, THE SUMMY LETTER

21    TO THE PLAINTIFFS IN RESPONSE TO A SUBPOENA.  IT'S MY

22    ASSUMPTION THAT WAS WITHOUT CONSULTING WARNER, WHO IS THE

23    SUCCESSOR TO SUMMY.  WARNER FOUND OUT ABOUT IT -- I WAS GOING

24    TO SAY SOMETHING A LITTLE FLIPPANT, BUT I'M NOW NOT GOING TO

25    BECAUSE WE'RE ON THE RECORD HERE -- ASSERTED ITS PRIVILEGE

11

1   AND REQUESTED ESSENTIALLY A CLAW-BACK.

2           AND WHETHER IT WAS UNDER RULE 26(B)(5) OR FEDERAL

3   RULE OF EVIDENCE 502, WARNER CONTENDED THAT THE MATERIALS

4   SHOULD NOT HAVE BEEN PRODUCED BECAUSE OF THE CLAIM OF

5   PRIVILEGE.  AND PLAINTIFFS -- AND I WOULD -- I'M PREPARED TO

6   FIND THAT THE REQUESTS FROM WARNER SUBSTANTIALLY COMPLIED

7   WITH THE RULES.  I'M ALSO PREPARED TO FIND THAT PLAINTIFF'S

8   ACTIONS TO SEQUESTER THE MATERIALS AND BRING THIS ISSUE

9   BEFORE THE COURT SUBSTANTIALLY COMPLIED WITH 26(B)(5) AS

10  WELL.

11          I KNOW YOU HAVE ISSUES ABOUT TIMING AND HOW LONG IT

12  TOOK ONE SIDE TO DO SOMETHING AND ONE SIDE TO DO THE OTHER.

13  FRANKLY, GIVEN WHAT'S BEEN GOING ON, I FIND THAT BOTH PARTIES

14  ACTED REASONABLY AND SUBSTANTIALLY COMPLIED WITH THE RULE.

15          I ALSO AM PREPARED AS WE HAD DISCUSSED PREVIOUSLY

16  -- I'M PREPARED TO CONCLUDE THAT THE ISSUE IS NOT REALLY

17  WHETHER ASCAP'S PRODUCTION -- AND I BELIEVE IT WAS

18  INADVERTENT OR MAYBE NOT FULLY INFORMED -- DOESN'T SERVE TO

19  HAVE WAIVED WHATEVER PRIVILEGE IS IN EXISTENCE HERE.  THAT

20  IS, I DON'T THINK I HAVE A BASIS TO SAY THAT THE 2014

21  PRODUCTION BY ASCAP IS SUFFICIENT TO HAVE CAUSED A WAIVER OF

22  WHATEVER PRIVILEGE IS HERE.

23          I THINK THE ISSUE IS WHETHER THE PRIVILEGE HAD BEEN

24  WAIVED BACK IN 1979 WHEN THE MATERIALS GOT INTO ASCAP'S

25  FILES.  I FIND THAT IF SOMEONE RUMMAGES THROUGH THE FILES IN

12

1   2014 AND TURNS SOMETHING OVER, YOU KNOW, THERE'S PROBLEMS,

2   THERE'S ISSUES.  BUT, YOU KNOW, PRIVILEGE ISSUES ARE

3   SIGNIFICANT.

4           AND, SO, WE HAD SPENT TIME ON PREVIOUS PHONE CALLS

5   TALKING ABOUT WHAT I NEED TO KNOW IN ORDER TO MAKE A

6   DETERMINATION ABOUT WHAT I TAKE TO BE THE ISSUE, THIS 1979

7   TRANSFER FROM SUMMY TO ASCAP.

8           AND I THINK THAT THERE ARE TWO ISSUES OF REAL

9   INTEREST TO ME THAT I THINK ARE DISPOSITIVE OF THE ISSUE OF

10  WHETHER THERE WAS A PRIVILEGE OR WHETHER THAT PRIVILEGE WAS

11  WAIVED.  AND THAT HAS TO DO WITH THE NATURE OF THE

12  RELATIONSHIP BETWEEN SUMMY, SLASH, WARNER ON THE ONE SIDE AND

13  ASCAP ON THE OTHER AND THE PURPOSE FOR SUMMY TRANSMITTING THE

14  COUDERT MATERIALS TO ASCAP.

15          AND I WILL SAY THAT I THINK I HAVE A PRETTY GOOD

16  HANDLE ON THE RELATIONSHIP BETWEEN WARNER OR SUMMY AS THE

17  PUTATIVE RIGHTHOLDER AND ASCAP.  I THINK I KNOW WHAT THAT

18  RELATIONSHIP IS.  IT'S PRETTY CLEAR.  IT'S ALMOST COMMON

19  KNOWLEDGE.

20          I DON'T THINK THAT THERE IS QUITE AS MUCH DIRECT

21  EVIDENCE ABOUT THE PURPOSE OF TRANSMITTING THE COUDERT

22  MATERIALS TO ASCAP.  AND, YOU KNOW, PART OF THAT IS JUST THE

23  MIST OF TIME.  IT'S SOMETHING THAT OCCURRED 30-SOME-ODD YEARS

24  AGO.  AND I DON'T HAVE ANY DIRECT MATERIAL FROM EITHER MS.

25  SENGSTRACK --

13

1          MR. RIFKIN:  SENGSTACK -- S-E-N-G- --

2          THE COURT: -- SENGSTACK, S-E-N-G-S-T-A-C-K, AND THE

3    PERSON AT ASCAP.  THAT'S JUST 30-SOME-ODD YEARS AGO.

4          BUT I HAVE THE LETTER ITSELF, AND I THINK -- I

5    THINK WE CAN INTUITIVELY FIGURE OUT WHAT'S GOING ON HERE.

6          AND LET ME BE CLEAR.  IT IS WARNER'S BURDEN TO

7    ESTABLISH THAT THE ATTORNEY-CLIENT PRIVILEGE EXISTS AND

8    APPLIES, AND THAT IT HASN'T BEEN WAIVED.  THAT IS THE BURDEN

9    OF THE PARTY ASSERTING THE PRIVILEGE.

10         AND I AM OBLIGED TO CONSIDER A PRIVILEGE CLAIM

11   CLOSELY AND NARROWLY BECAUSE THE ATTORNEY-CLIENT PRIVILEGE,

12   AS WITH ANY OTHER PRIVILEGE, PREVENTS THE FULL AND FAIR

13   DISCLOSURE OF INFORMATION.  IT'S A WAY TO RESIST DISCOVERY.

14   AND THE FEDERAL SYSTEM FAVORS DISCOVERY, FAVORS PRETRIAL OF

15   CASES AND DISCLOSURE OF INFORMATION.  AND, SO, A CLAIM OF

16   PRIVILEGE OBSTRUCTS THAT AND MAY OBSTRUCT IT PROPERLY, BUT ON

17   THAT BASIS IT HAS TO BE DONE NARROWLY AND WITH

18   SUBSTANTIATION.

19         SO, MY TWO BIG ISSUES ARE THE NATURE OF THE

20   RELATIONSHIP BETWEEN THE RIGHTHOLDER AND ASCAP AND THEN THE

21   PURPOSE OF TRANSMITTING THIS MATERIAL TO ASCAP.

22         SO, MY FIRST AREA OF INQUIRY IS WHAT IS ASCAP.  AND

23   I FOUND CONSIDERABLE INFORMATION IN THE MATERIALS, PRIMARILY

24   MR. REIMER'S DECLARATION WHICH WAS -- MR. REIMER IS A LAWYER

25   AT ASCAP, AND HE SUBMITTED A DECLARATION.  AS I UNDERSTAND

14

1    IT, IT WAS IN CONNECTION WITH THE PROCEEDINGS IN NEW YORK TO

2    QUASH SOME DEPOSITIONS.

3            AGAIN, YOU ALL WENT CRAZY ON SOME OF THIS STUFF.

4    THAT'S FINE.  I'M NOT CRITICAL.  DOING YOUR STUFF.  DOING IT

5    AT A VERY HIGH LEVEL.

6            MR. REIMER GAVE A DECLARATION.  HE'S AN IN-HOUSE

7    LAWYER AT ASCAP, AND HE GAVE A BRIEF DESCRIPTION OF WHAT

8    ASCAP IS.

9            THERE WAS ALSO INFORMATION IN THE DEPOSITION OF MR.

10   BLEITZ, B-L-E-I-T-Z, WHO I UNDERSTAND TO BE EXECUTIVE AT

11   WARNER WHO HAS INTERACTION WITH ASCAP.

12           AND, THEN, THERE WERE SOME OTHER MATERIALS PROVIDED

13   BY THE DEFENSE.  THERE'S AN AGREEMENT BETWEEN WARNER AND

14   ASCAP THAT SETS OUT WHAT ASCAP DOES.

15           AND MY UNDERSTANDING IS THAT ASCAP IS A MEMBERSHIP

16   ASSOCIATION OF SONG WRITERS AND OTHERS WHO OWN MUSICAL

17   COPYRIGHTS.  AND AT THE REQUEST OF THOSE MEMBERS, ASCAP CAN

18   LICENSE THE PUBLIC PERFORMANCE COMPONENT OF THE COPYRIGHT FOR

19   SONGS, FOR THINGS SUCH AS RADIO BROADCASTS AND LIVE

20   PERFORMANCES.

21           WHAT ASCAP DOES IS IT COLLECTS FEES FROM

22   PERFORMANCES OR PERFORMERS WHERE THERE'S A LICENSE TO PERFORM

23   COPYRIGHTED MATERIAL AND DISTRIBUTES THOSE FEES TO THE RIGHTS

24   HOLDERS.

25           ASCAP MAKES CLEAR IN MR. REIMER'S DECLARATION THAT

1    IT DOES NOT OWN COPYRIGHTS ON BEHALF OF ITS MEMBERS.  AND IT

2    DOES NOT KEEP THE FEES THAT ARE DERIVED FROM THE PUBLIC

3    PERFORMANCES -- ALTHOUGH IT IS COMPENSATED.  AND I KNOW THERE

4    WAS AN AMBIGUITY IN MR. REIMER'S DECLARATION, AND I TAKE IT

5    TO BE AN AMBIGUITY BECAUSE HE SAYS WE DON'T GET PAID FROM THE

6    FEE.  BUT THEN HE SAYS WE GET PAID ESSENTIALLY FROM THE FEE.

7    AND I THINK -- I THINK THERE'S AN AMBIGUITY HERE.  AND I

8    UNDERSTAND WHY BOTH PARTIES READ IT VERY CLOSELY.  BUT MY

9    UNDERSTANDING FROM OTHER ASPECTS OF THE DECLARATION IS THAT

10   ASCAP GETS PAID ITS EXPENSES OR SOME PREDETERMINED FEE OR

11   PERCENTAGE FROM THE LICENSES -- FROM THE FEES IT DERIVES FROM

12   LICENSES.  AND I KNOW THAT THERE'S AN UNBELIEVABLY COMPLEX

13   STRUCTURE WHERE THEY TAKE IN MONEY FROM BROAD LICENSES AND

14   PAY IT OUT TO HUNDREDS OF THOUSANDS OF PERFORMERS.  I HAVE

15   FRIENDS WHO ARE PERFORMERS.  I'M NOT GOING TO INJECT MY

16   PERSONAL STUFF, BUT THERE'S ALL KINDS OF STUFF ABOUT

17   RESIDUALS, ROYALTIES, LICENSES.  BUT THAT'S WHAT ASCAP DOES.

18          ASCAP ISSUES LICENSES TO BARS AND RADIO STATIONS

19   AND COLLECTS MONEY AS A PERFORMING RIGHTS ORGANIZATION ON

20   BEHALF OF ITS MEMBERS.  IT'S OWNED BY ITS MEMBERS.  AND ONE

21   OF THE OTHER THINGS THAT IT DOES IS IT POLICES RIGHTS FOR ITS

22   MEMBERS.  THE STRUCTURE OF COLLECTING FEES HAS TO DO WITH

23   WHERE'S THERE'S BEEN A LICENSE NEGOTIATED WITH A BAR OR A

24   RADIO STATION.  BUT IF THERE IS A PUBLIC PERFORMANCE OF A

25   COPYRIGHTED WORK THAT DOES NOT -- WHERE THE PERFORMER DOES

16

1   NOT HAVE PERMISSION AND THERE'S A CLAIM OF INFRINGEMENT,

2   ASCAP IS ENTITLED AND HAS BEEN HIRED TO PURSUE THOSE

3   INFRINGERS ON BEHALF OF THE RIGHTS OWNER.

4           AND THAT'S WHAT MR. BLIETZ TESTIFIED ABOUT.  HE

5   SAID THAT ASCAP AS HE UNDERSTOOD IT -- AND HE WAS VAGUE ABOUT

6   IT -- NOT ALL THE WAY TO BRIGHT ON IT.  BUT HE UNDERSTOOD

7   THAT ASCAP CAN SUE PEOPLE ON BEHALF OF WARNER FOR

8   INFRINGEMENT OF WARNER'S RIGHTS.

9           AND THAT'S CERTAINLY CLEAR FROM THE WRITTEN

10  AGREEMENT THAT I REVIEWED, WHICH WAS EXHIBIT D TO MR. KLAUS'S

11  DECLARATION, THAT ASCAP HAS THE RIGHT TO SUE IN A COPYRIGHT

12  ACTION ON BEHALF OF ITS RIGHTS OWNER.  AND THAT'S -- THAT --

13  THAT MAKES SENSE TO ME BECAUSE THAT'S WHAT COPYRIGHT IS.

14          COPYRIGHT IS A PROTECTION OF INTELLECTUAL PROPERTY.

15  AND INTELLECTUAL PROPERTY GETS USED THROUGH LICENSES.  AND IT

16  GETS EXPLOITED BY PEOPLE WHO OWN THOSE RIGHTS.  AND THOSE

17  RIGHTS REGULARLY GET WIELDED AGAINST PEOPLE WHO USE PROTECTED

18  MATERIAL WITHOUT PERMISSION BECAUSE THEY DON'T OWN THE

19  RIGHT.  COPYRIGHT IS A PRECONDITION TO LITIGATION.  AND

20  THAT'S WHY IT WAS IN OUR CONSTITUTION IN 1787.  I'M TALKING

21  TO COPYRIGHT LAWYERS LIKE THEY DON'T KNOW THAT.  OF COURSE

22  THEY KNOW THAT.

23          AND WHERE THAT LEADS IS THAT IN ORDER TO ASSERT A

24  COPYRIGHT CLAIM ONE MUST DEMONSTRATE OWNERSHIP.  THAT'S AN

25  ELEMENT OF A CLAIM OF INFRINGEMENT.  I AM THE PARTY

1   PLAINTIFF.  I OWN THIS RIGHT.  YOU, THE INFRINGING DEFENDANT,

2   DO NOT.  YOU DON'T OWN IT OR YOU DON'T HAVE PERMISSION TO USE

3   MY RIGHT.

4           AND, SO, NOW, WE GET TO THE ISSUE OF THE

5   COMMUNICATION BETWEEN SUMMY AND ASCAP.  ASCAP WAS HIRED TO

6   ADMINISTER SUMMY'S RIGHTS.  I PRESUME -- ALTHOUGH, CERTAINLY,

7   WARNER WAS DOWN THE ROAD.  AND ASSUMING THAT RELATIONSHIP,

8   ASCAP WAS ENTITLED TO AND REQUESTED TO POLICE THE RIGHTS FOR

9   SUMMY'S COPYRIGHTED MATERIAL.

10          AND, SO, WE GET TO THE ISSUE AS TO -- ABOUT SUMMY

11  SENDING THE COUDERT MATERIALS TO ASCAP.  AND THE TRANSMITTAL

12  LETTER AND THE SUPPORTING MATERIALS NOT ENTIRELY CLEAR -- NOT

13  ENTIRELY CLEAR.  BUT I THINK CIRCUMSTANTIALLY IT'S PRETTY

14  APPARENT TO ME THAT IF ASCAP WERE TO NEGOTIATE LICENSES OR

15  SUE ALLEGED INFRINGERS ON BEHALF OF SUMMY BASED ON SUMMY'S

16  COPYRIGHT IN THE "HAPPY BIRTHDAY" SONG, IF ASCAP WERE TO DO

17  THOSE THINGS AS PART OF ITS AGREEMENT, THEN, ASCAP WAS

18  ENTITLED TO KNOW, AND WOULD BE REQUIRED TO PROVE IN A COURT,

19  THAT ITS RIGHTS AND THE RIGHTS IT DERIVED FROM SUMMY WERE

20  LEGITIMATE.

21          AND IT MAKES SENSE TO ME THAT IF SUMMY HAD

22  INFORMATION, AND IF IT WAS PRIVILEGED INFORMATION, REGARDING

23  ITS OWN OWNERSHIP IN THE "HAPPY BIRTHDAY" SONGS, THAT

24  PROVIDING THAT INFORMATION TO ITS LICENSING AGENT IN ADVANCE

25  OF SOME DISPUTE, THAT MAKES SENSE TO ME.

1        NOW, I WILL NOTE THAT SUMMY DID NOT HAVE TO PROVIDE

2    PRIVILEGED INFORMATION IN ORDER TO DO THAT.  SUMMY COULD HAVE

3    CHOSEN TO DO SOMETHING THAT REGULARLY OCCURS IN THE

4    SECURITIES CONTEXT.  I DON'T KNOW IF IT OCCURS IN THE

5    COPYRIGHT CONTEXT, BUT I KNOW IT OCCURS IN THE SECURITIES

6    CONTEXT, WHICH IS SOMETHING ALONG THE LINES OF A 10(B)(5)

7    LETTER OR A COMFORT LETTER.

8        SUMMY COULD HAVE SAID, OR SUMMY COULD HAVE HAD ITS

9    COUDERT BROTHERS LAWYERS, JUST SAY WE OWN THIS COPYRIGHT.

10   WE'LL BACK YOU UP.  WE'LL PROVIDE INFORMATION AT A LATER

11   DATE, OR YOU'RE ENTITLED TO RELY ON OUR CLAIM TO AVOID

12   MALICIOUS PROSECUTION CLAIMS OR CLAIMS OF -- THAT WE'RE

13   ACTING ULTRA VIRES.

14       IT HAPPENS EVERY DAY OF THE WEEK IN THE SECURITIES

15   CONTEXT.  A BOND ISSUER OR THE BOND ISSUER'S LAWYER WILL

16   ISSUE A LETTER TO AN UNDERWRITER SAYING THESE BONDS ARE

17   PROPER.  THEY WERE LAWFULLY ISSUED.  WE'RE NOT GIVING YOU

18   PRIVILEGED INFORMATION, BUT WE'RE GIVING YOU AN OPINION THAT

19   YOU CAN RELY ON.

20       BUT THAT DIDN'T HAPPEN HERE.  AND SUMMY CHOSE TO

21   GIVE PRIVILEGED INFORMATION RECEIVED FROM THE COUDERT FOLKS

22   ABOUT -- ABOUT THE NATURE OF ITS OWNERSHIP AND ITS CLAIMS AND

23   THE STATUS OF THINGS.

24       AND, SO, ONE OF THE ARGUMENTS THAT WARNER ASSERTS

25   HERE IS THAT ASCAP IS ACTUALLY WITHIN THE PRIVILEGE

19

1   RELATIONSHIP -- THAT THE RELATIONSHIP THAT SUMMY HAD WITH ITS

2   LAWYER AT COUDERT WAS IN A SENSE EXTENDED TO THE LAWYER AT

3   ASCAP.

4           WE THEN ALSO GET INTO ISSUES OF THE COMMON INTEREST

5   EXCEPTION TO THE WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE.

6   AND I WILL TELL YOU THAT I'VE SORT OF STRUGGLED IN WHAT MY

7   APPROPRIATE FRAMEWORK IS HERE BECAUSE I KIND OF SEE TWO

8   CLAIMS FROM WARNER.

9           I SEE WARNER SAYING THAT THE DISCLOSURE TO -- TO

10  ASCAP IN 1979 WAS NOT A WAIVER OF THE PRIVILEGE AT ALL.  AND

11  THERE IS A RELIANCE ON THE SCHWARTZ CASE AND THE UNITED

12  STATES VERSUS ASCAP CASE, BOTH DISTRICT COURT OPINIONS FROM

13  THE FEDERAL COURT IN NEW YORK, WHICH HAS REAL FAMILIARITY

14  WITH ASCAP.  AND THERE WAS A REFERENCE TO THE FACT THAT A LOT

15  OF ASCAP LITIGATION BY VIRTUE OF CONSENT DECREES, I THINK --

16          YES, I READ YOUR PAPERS, FOLKS.  I READ -- I READ

17  -- I READ YOUR PAPERS, FOLKS.

18          -- THAT THE NEW YORK COURTS HAVE REAL FAMILIARITY

19  WITH ASCAP.

20          AND THERE IS -- THERE ARE SOME PRETTY CLEAR

21  STATEMENTS IN THOSE DECISIONS THAT AN UNINCORPORATED

22  ASSOCIATION LIKE ASCAP AND THE ASSOCIATION'S LAWYER DOES HAVE

23  AN ATTORNEY-CLIENT RELATIONSHIP WITH ITS MEMBERS.  NOW, THAT

24  LAW HAS EVOLVED AND CHANGED OVER THE YEARS.  BUT WHERE THERE

25  IS A SHOWING THAT A MEMBER OF THE ASSOCIATION IS SEEKING

20

1  LEGAL ADVICE FROM THE LAWYER FOR THE ASSOCIATION, THAT THE

2  PRIVILEGE EXTENDS TO THAT RELATIONSHIP.  THAT'S KIND ONE OF

3  THE ARGUMENTS THAT I HEARD FROM -- FROM WARNER.

4         AND THEN IN THE ALTERNATIVE -- AND I DON'T THINK

5  THAT THEY'RE EXCLUSIVE -- THE ARGUMENT IS THAT, WELL, IF THE

6  TRANSMITTAL OF THIS INFORMATION TO ASCAP OR ASCAP'S GENERAL

7  COUNSEL WAS BASICALLY BRINGING IN A THIRD PARTY TO THE

8  RELATIONSHIP, SOMEONE OUTSIDE OF THE DIRECT ATTORNEY-CLIENT

9  RELATIONSHIP, THAT COULD BE A WAIVER.  BUT THERE IS AN

10 EXCEPTION TO THE WAIVER.  AND THAT'S THE COMMON INTEREST

11 CLAIM.

12        AND THE LAW IS CLEAR.  AND I READ WITH GREAT

13 INTEREST THE NIDEC CASE, N-I-D-E-C, AS WELL AS THE POTATO

14 CASE.  I'M JUST GOING TO CALL IT THE POTATO CASE AS WELL AS

15 -- I THINK IT WAS THE LOVE CASE FROM JUDGE RYU UP IN THE

16 NORTHERN DISTRICT, WHICH IS THAT WHERE THERE IS A

17 COMMUNICATION MADE TO ANOTHER PARTY IN THE COURSE OF A MATTER

18 OF COMMON INTEREST, AND THE COMMUNICATION IS DESIGNED TO

19 FURTHER THAT EFFORT, THAT WILL NOT BE A WAIVER OF THE

20 PRIVILEGE.

21        AND THERE'S SOME REAL FACTUAL ANALYSIS THAT HAS TO

22 OCCUR HERE BECAUSE THE DOCTRINE DOES NOT EXTEND TO

23 COMMUNICATIONS THAT ARE BUSINESS ORIENTED OR HAVING TO DO

24 WITH BUSINESS STRATEGY.  PARTIES HAVE TO DEMONSTRATE AS JUDGE

25 RYU WROTE, "COOPERATION INFORMING A COMMON LEGAL STRATEGY."

1    AND THE COMMUNICATION HAS TO ADVANCE THAT LEGAL STRATEGY.

2            SO, IN THE CASE OF THE POTATO LITIGATION THERE WAS

3    SOME COOPERATIVE POTATO MARKETING GROUP.  AND THERE WERE

4    DISCUSSIONS ABOUT COMPLIANCE WITH FEDERAL LAW SO THAT

5    SOMETHING INVOLVING POTATOES DOESN'T BREAK THE LAW.

6            AND THE DISTRICT COURT IN THE POTATO CASE -- HEY,

7    NOT COINCIDENTALLY, UP IN IDAHO -- CONCLUDED THAT THE

8    TRANSACTIONS THERE WERE JUST STRAIGHT BUSINESS DEALS.  THIS

9    HAD TO DO WITH MARKETING POTATOES, AND THAT WHATEVER LEGAL

10   ISSUES WERE DISCUSSED WERE REALLY TANGENTIAL TO THE

11   COMMUNICATIONS.

12           SO, WHERE I AM IS THIS.  I THINK I NEED TO KNOW --

13   AND I NEED TO DETERMINE AS BEST I CAN WHAT WAS THE

14   RELATIONSHIP BETWEEN SUMMY AND ASCAP AND WHY WAS THIS

15   MATERIAL CONVEYED FROM SUMMY TO ASCAP.

16           AND I THINK IT'S FAIR TO SAY AFTER SORT OF BRIEFLY

17   REVIEWING THE UNDERLYING COUDERT MATERIALS -- LIKE I SAID, I

18   DIDN'T GO LINE BY LINE BECAUSE I DON'T THINK IT'S RELEVANT,

19   ESPECIALLY SINCE THERE'S AN ACKNOWLEDGMENT THAT THE PRIVILEGE

20   APPLIES THERE.  BUT THE ISSUE IS WHY WOULD SUMMY WANT TO

21   TRANSMIT THAT INFORMATION TO ASCAP.  WHAT'S THE POINT.

22           AND I THINK -- I THINK IT IS FAIR TO CONCLUDE THAT

23   THE POINT WAS BECAUSE DOWN THE ROAD ASCAP MIGHT BE LITIGATING

24   THOSE COPYRIGHTS -- LICENSING OR LITIGATING THOSE COPYRIGHTS

25   ON BEHALF OF SUMMY.  AND I DON'T THINK THAT'S MAGIC.  I DON'T

1  THINK THAT'S UNANTICIPATED.  THAT'S WHAT ASCAP DOES.  THAT'S

2  WHY PEOPLE HIRE ASCAP TO ADMINISTER THESE RIGHTS BECAUSE AN

3  INDIVIDUAL COMPANY CAN'T GO TO EVERY RADIO STATION AND EVERY

4  BAR AND POLICE THE RIGHTS.

5          AND GIVEN THAT THERE MAY HAVE BEEN SOME MURKINESS

6  REGARDING THE STATUS OF THE COPYRIGHT TO THE "HAPPY BIRTHDAY"

7  SONGS, BACK THEN AND TODAY, THAT'S WHY YOU FOLKS ARE HERE IN

8  2014.  BECAUSE THERE ARE LEGITIMATE DISPUTES AS SET FORTH IN

9  THE COMPLAINT ABOUT THE LEGITIMACY OF THE RIGHTS AND WHETHER

10  THEY WERE EXPIRED, WHETHER THE SONG IS IN THE PUBLIC DOMAIN.

11  PROBABLY EVEN MORE.

12          I THINK IT'S FAIR TO SAY THAT SOME OF THOSE ISSUES

13  EXISTED IN 1976, 1978 AND IN 1979 WHEN THIS INFORMATION WAS

14  TRANSMITTED TO THE GENERAL COUNSEL OF ASCAP -- NOT IN

15  ANTICIPATION OF OR IN RESPONSE TO A SPECIFICALLY IDENTIFIED

16  LAWSUIT.  I DON'T THINK THE RECORD SHOWS THAT AT ALL.  BUT

17  COULD IT HAVE BEEN COMING DOWN THE PIKE.  AND WAS THERE A

18  NEED TO FORMULATE A COMMON LEGAL STRATEGY, WHICH IS THE

19  LANGUAGE IN THE POTATO CASE.

20          THE EVIDENCE IS THIN BECAUSE WE'RE TALKING ABOUT

21  SOMETHING HISTORICAL, BUT I THINK IT'S A FAIR INFERENCE.  I

22  THINK IT'S A FAIR INFERENCE.

23          I WAS -- I WAS TRYING TO READ THIS VERY NARROWLY.

24  THAT'S MY OBLIGATION AND IT'S -- THE PLAINTIFFS HAVE QUITE

25  PROPERLY SOUGHT TO PURSUE A CLAIM THAT THIS PRIVILEGE WAS

23

1   WAIVED AND THAT THE COMMON INTEREST DOCTRINE DOES NOT APPLY.

2   AND I READ EVERYTHING CLOSELY AND NARROWLY AS I'M OBLIGED TO

3   DO.

4           ONE THING THAT I COULD NOT GET ON BOARD WITH,

5   THOUGH, WAS --

6           AND I'M HAPPY TO HEAR FROM YOU ON THIS.  I HAVEN'T

7   -- THIS IS A TENTATIVE, AND I WANT TO HEAR FROM YOU FOLKS.

8   BECAUSE IF I DON'T HAVE IT RIGHT, I DON'T WANT TO DO IT.

9           BUT WHEN YOU FOLKS SAID ON THE PLAINTIFF'S SIDE

10  THAT MS. STENGSTACK -- SENGSTACK GRATUITOUSLY TURNED OVER

11  THIS MATERIAL TO ASCAP, GRATUITOUSLY, IMPLYING NO PURPOSE,

12  IMPLYING THAT IT WAS SORT OF A RANDOM EVENT, IMPLYING THAT

13  THERE WAS NO -- NO MERIT OR NO LEGAL SIGNIFICANCE TO THIS, I

14  JUST RESPECTFULLY WASN'T CONVINCED.

15          I THINK THE FACT THAT A PUBLISHING HOUSE THAT HAD

16  GONE OUT TO WHAT AT THE TIME WAS, YOU KNOW, ONE OF AMERICA'S

17  PREMIER LAW FIRMS TO GET SOME PRETTY DETAILED ANALYSIS OF THE

18  EXISTENCE AND STATUS OF ITS COPYRIGHT CLAIM, AND THEN

19  PROVIDED THAT TO NOT A FUNCTIONARY AT ASCAP, NOT SOME

20  LOW-LEVEL EXECUTIVE OR OFFICE MANAGER OR ANYTHING, BUT THE

21  GENERAL COUNSEL OF AMERICA'S BIGGEST -- OR SECOND BUSINESS.

22  THEY CAN FIGHT ABOUT THAT -- YOU KNOW, A MAJOR LICENSING

23  FIRM, THAT FELT LIKE IT WASN'T GRATUITOUS.  THAT FELT LIKE

24  THERE WAS A REAL ISSUE ON WHICH ONE OR BOTH PARTIES NEEDED

25  GUIDANCE, AND THIS COMMUNICATION SEEMED TO HAVE BEEN DONE

24

1    WITH THE INTENTION OF ADVANCING A COMMON LEGAL STRATEGY,

2    EXPLOITATION OF THIS RIGHT, AND BEING DONE AT QUITE A HIGH

3    LEVEL.

4            SO, WHERE I AM IS THIS.  I HAVE TO DEAL WITH -- AND

5    I'M PREPARED TO ACCEPT THE SCHWARTZ AND ASCAP CASES'

6    STATEMENT THAT BY VIRTUE OF THE NATURE OF WHAT ASCAP IS, THIS

7    ASSOCIATION, THAT IS OWNED BY AND OPERATES ON BEHALF OF ITS

8    MEMBERS.  I THINK WARNER OWNS ONE-FIVE HUNDRED THOUSANDTH OF

9    WHATEVER THIS SAYS -- YOU KNOW, THERE'S PRETTY COMPELLING LAW

10   THAT SAYS THAT COMMUNICATIONS BETWEEN THE MEMBERS AND THAT

11   ORGANIZATION'S LAWYER CAN BE PRIVILEGED, ASSUMING THEY

12   DEMONSTRATE THESE ADDITIONAL FACTS THAT IT WAS FOR OBTAINING

13   LEGAL ADVICE.  AND THAT'S WHERE I THINK THE MORE RECENT ASCAP

14   CASE DID NARROW THE ORIGINAL SCHWARTZ STATEMENT, AND I'M

15   PREPARED TO GO WITH THE MORE NARROW FORMULATION IN THE

16   U.S. VERSUS ASCAP DECISION.

17           I THINK -- I THINK THEY'RE THERE.  I THINK THIS IS

18   A PROTECTED COMMUNICATION WITHIN THE SCOPE OF THE PRIVILEGE.

19           AS TO THE ALTERNATIVE ARGUMENT THAT IF THE

20   COMMUNICATION, IF THE TRANSMITTAL WAIVED THE PRIVILEGE, BUT

21   TO RESCUE THE PRIVILEGE, WE'D EXAMINE THE COMMON INTEREST

22   EXCEPTION, WHICH ALSO HAS TO BE CONSTRUED NARROWLY.

23           AND BOTH SIDES DID A NICE JOB RESEARCHING THIS, AND

24   I KNOW THAT THERE ARE CASES ON BOTH SIDES OF THIS ISSUE.  AND

25   THE POTATO CASE AND THE NIDEC CASE AND THERE'S A FEDERAL

25

1  CIRCUIT CASE HAVING TO DO WITH PATENT LAW.  I LOOKED AT THEM.

2  I JUST FIND THAT THE NATURE OF COPYRIGHT IS AN INTELLECTUAL

3  PROPERTY RIGHT.  AND THE NATURE OF WHAT ASCAP WAS HERE TO DO,

4  NOT TO DEVELOP THE PRODUCT.  THERE WASN'T A MERGER OF TWO

5  COMPETING BUSINESSES.  THERE WASN'T AN EVALUATION OF THE

6  VALIDITY OF THE "HAPPY BIRTHDAY" COPYRIGHT IN ORDER TO VALUE

7  SUMMY FOR SOME TRANSACTION, WHICH IS WHAT I UNDERSTAND SOME

8  OF THE CASES HAVE GONE OFF ON.

9        MY TAKE WAS THAT THIS WAS SUMMY HIRING AN OUTSIDE

10 PARTY FOR PURPOSES OF ASSERTING SUMMY'S OWN RIGHTS.  AND IN

11 ORDER TO EFFECTIVELY DO THAT, CHOSE TO CONVEY PRIVILEGED

12 INFORMATION WITH THE UNSTATED, BUT PRETTY APPARENT,

13 EXPECTATION THAT THE MATERIAL WOULD STAY WITHIN THE

14 PRIVILEGE.  AND THAT THERE WAS AN INTENDED -- THERE WAS

15 LITIGATION ANTICIPATED BECAUSE PEOPLE FIGHT IN FEDERAL COURT

16 ALL THE TIME ABOUT COPYRIGHT.

17       AND THE SPECIFIC TRANSACTION AT ISSUE HERE, THE

18 SPECIFIC COMMUNICATION AND THE UNDERLYING MATERIAL RELATING

19 TO THE VALIDITY OF THE RIGHT OF THE COPYRIGHT I THINK DOES

20 FALL WITHIN THE COMMON INTEREST EXCEPTION TO THE WAIVER OF

21 THE ATTORNEY-CLIENT PRIVILEGE AS SET FORTH IN THE CASES CITED

22 TO ME.

23       SO, THAT'S TENTATIVELY WHERE I AM BASED ON A VERY

24 THOROUGH REVIEW OF SOME VERY GOOD PAPERS FROM BOTH SIDES.

25 I'M NOT JUST COMPLIMENTING YOU BECAUSE I LIKE TO DISARM.  I'M

26

1   COMPLIMENTING YOU BECAUSE YOU DID A GOOD JOB.  AND BOTH SIDES

2   KNOW THIS STUFF VERY, VERY WELL.

3           BUT I THINK THAT BASED ON WHAT I HAVE HERE I DO NOT

4   HAVE A BASIS FOR OVERRULING THE CLAIM OF PRIVILEGE AS

5   REQUESTED BY PLAINTIFFS.

6           I KNOW YOU'VE ASKED FOR OTHER RELIEF, AND I'M NOT

7   ENTIRELY SURE I SEE HOW IT PLAYS IN.

8           SO, WHAT MAY MAKE SENSE TO DO IS EITHER HEAR FROM

9   YOU RIGHT NOW IF YOU WANT CLARIFICATION OF MY THOUGHTS.  IF

10  YOU WANT TO TAKE A FEW MINUTES AND TALK TO YOUR COLLEAGUES

11  AND FIGURE OUT WHAT YOU WANT TO DO SO WE CAN DO THIS IN AN

12  ORDERLY WAY, I'M FINE WITH THAT AS WELL.

13          GOT A PREFERENCE?  MR. RIFKIN LEAPING TO HIS FEET.

14          MR. RIFKIN:  WELL, YOUR HONOR, IT MAKES NO

15  DIFFERENCE TO ME.  I'M PREPARED TO TRY TO ADDRESS SOME OF

16  YOUR CONCERNS NOW.  IT'S OUR MOTION.  ALTHOUGH IT IS THE

17  DEFENDANT'S BURDEN, IT'S OUR MOTION.  SO, I WOULD EXPECT THAT

18  WE WOULD ADDRESS YOUR HONOR FIRST IN ANY EVENT.  BUT IN LIGHT

19  OF YOUR HONOR'S TENTATIVE IT CERTAINLY MAKES SENSE FOR US --

20          THE COURT:  THAT'S RIGHT.

21          MR. RIFKIN:  -- TO DO THAT.  AND I'M PREPARED TO

22  PROCEED NOW.

23          BUT YOU SAID ORIGINALLY THAT YOU THOUGHT MAYBE YOU

24  MIGHT WANT TO TAKE A BREAK.  SO, BEFORE I JUMP RIGHT IN --

25          THE COURT:  OH, NO, I'M READY.  I'M READY.

27

1          MR. RIFKIN:  YOU'RE READY TO GO?

2          THE COURT:  -- CLEAR YOUR CALENDARS.  CANCEL YOUR

3   DINNER PLANS.

4          (LAUGHTER.)

5          MR. RIFKIN:  OKAY.  NOT TO -- NOT TO -- NOT TO MAKE

6   A JOKE ABOUT ONE OF THE CASES WE BRIEFED, BUT THIS IS THE BIG

7   LEAGUES.

8          THE COURT:  AND YOU'VE GOT YOUR MLB STUFF AS WELL.

9          MR. RIFKIN:  THERE YOU GO.  THERE YOU GO.

10          THE COURT:  BUT YOU SUCCESSFULLY CONVINCED ME IT

11   WAS SUCH A BRIEF DECISION THAT IT --

12          MR. RIFKIN:  YES.

13          THE COURT:  IT DIDN'T WARRANT THE HIGHEST RELIANCE.

14          BUT GO AHEAD.  YOU HAVE THE FIELD IN FRONT OF YOU.

15          MR. RIFKIN:  AND, YOUR HONOR, I DO -- I SINCERELY

16   APPRECIATE THE TENTATIVE RULING.  I DON'T GET TO PRACTICE

17   HERE ALL THAT FREQUENTLY AND WHEN I DO I LIKE HOW SOME OF THE

18   COURTS IN THIS DISTRICT ADOPT THE STATE COURT PRACTICE OF

19   ISSUING TENTATIVE DECISIONS.  IT MAKES -- IT MAKES IT MUCH

20   EASIER FOR US TO FOCUS IN ON THE ISSUES THAT ARE REALLY

21   GERMANE, WHICH IS WHAT I'D LIKE TO TRY TO DO NOW.

22          THE COURT:  I THINK YOU'LL HEAR THE FEDERAL JUDGES

23   SAY THAT THE STATE COURTS HAVE ADOPTED OURS.

24          MR. RIFKIN:  OKAY.  IT MAY VERY WELL BE THAT WAY.

25          (LAUGHTER.)

1        MR. RIFKIN:  IT MAY VERY WELL BE THAT WAY.

2        THE COURT:  THE SUPREMACY CLAUSE OF THE

3   CONSTITUTION IS ONE OF OUR FAVORITES.

4        MR. RIFKIN:  FAIR ENOUGH.  FAIR ENOUGH.

5        THE COURT:  GO AHEAD.

6        MR. RIFKIN:  SO, I THINK YOUR HONOR HAS CORRECTLY

7   SUMMARIZED THE ISSUES.  AND I DO WANT TO MAKE A COUPLE OF

8   VERY BRIEF INTRODUCTORY REMARKS.

9        AND, FIRST, WE DID NOT INTEND TO ARGUE -- AND IF WE

10  DIDN'T MAKE IT CLEAR ENOUGH, LET ME TRY TO DO THAT NOW.  WE

11  DID NOT INTEND TO ARGUE THAT WHEN MR. REIMER PRODUCED THE

12  DOCUMENTS TO US IN 2014 THAT THAT WAS A WAIVER.

13       INSTEAD WHAT WE THOUGHT WE TRIED TO EXPLAIN -- AND

14  I'LL TRY TO EMPHASIZE THIS A LITTLE BIT MORE NOW -- IS THAT

15  WHEN HE DID THAT, THAT SHOWED HOW ASCAP REGARDED THOSE

16  DOCUMENTS.

17       THE COURT:  THEY DID NOT REGARD IT AS CONFIDENTIAL.

18       MR. RIFKIN:  AS PRIVILEGED.  THEY DIDN'T BELIEVE --

19  IN OTHER WORDS -- AND I WILL TELL YOU, AND THIS IS ON THE

20  RECORD IN MR. REIMER'S DEPOSITION.  MR. REIMER CALLED ME --

21       THE COURT:  DO I HAVE THAT?

22       MR. RIFKIN:  YOU DO.  YOU HAVE BOTH TRANSCRIPTS.

23  THERE WAS A -- AND THEY WERE SUBMITTED.  THE FIRST ONE WAS

24  SUBMITTED WITH OUR JOINT STIPULATION.  THAT'S A TRANSCRIPT OF

25  MR. REIMER'S DEPOSITION TAKEN ON JULY 11TH.  THAT WAS THE

```
 1   SUBJECT OF ASCAP'S MOTION TO QUASH.

 2            THE COURT:  WHERE?

 3            MR. RIFKIN:  THEY DIDN'T WANT MR. REIMER TO

 4   TESTIFY.

 5            THE COURT:  WHERE?

 6            (PLAINTIFF'S COUNSEL CONFERRING.)

 7            THE COURT:  BECAUSE I FOUND BLEITZ --

 8            (PLAINTIFF'S COUNSEL CONFERRING.)

 9            THE COURT:  I FOUND BLEITZ AND I FOUND MARCOTUILLO.

10            MR. RIFKIN:  YES, THERE'S TWO TRANSCRIPTS.  AND,

11   YOUR HONOR, THEY WERE DONE AT TWO DIFFERENT TIMES.  SO,

12   THAT'S WHY THEY WERE SUBMITTED SEPARATELY.

13            THE SECOND ONE -- MS. MANIFOLD JUST HANDED ME THE

14   SECOND ONE.  MR. REIMER WAS DEPOSED ON JULY 11.

15            WHAT HAPPENED WAS THIS.  ASCAP ORIGINALLY --

16            THE COURT:  WELL, HANG ON.

17            WHAT IS THE DOCUMENT NUMBER?

18            MR. RIFKIN:  OKAY.

19            THE COURT:  BECAUSE I'M NOT SURE I HAVE IT.

20            MS. MANIFOLD:  HERE'S THE SUPPLEMENTAL ONE.

21            MR. RIFKIN:  OKAY.  I'M REFERRING NOW TO DOCUMENT

22   126-1.  AND IT'S EXHIBIT 14 OF THAT.  THAT'S THE SUPPLEMENTAL

23   DECLARATION THAT MS. MANIFOLD SUBMITTED TOGETHER WITH OUR

24   SUPPLEMENTAL BRIEF ON THE 22ND.  AND THAT'S THE RESUMPTION OF

25   MR. REIMER'S DEPOSITION ON JULY 21ST.
```

30

1          THE COURT:  ALL RIGHT.  WHAT HAPPENED WAS I

2     RECEIVED AN EXHIBIT 17 --

3          MR. RIFKIN:  NO.

4          THE COURT: -- WHICH SHOWED UP SUPPLEMENTALLY.

5          (PLAINTIFF'S COUNSEL CONFERRING.)

6          THE COURT:  ALL RIGHT.  I NEED TO TAKE A LOOK AT

7     THAT BECAUSE, YOU KNOW, YOU RUN A RISK WHEN YOU ASK FOR

8     UNDER-SEAL FILING OF THINGS BECAUSE IT DOESN'T COME THROUGH

9     THE COURT'S NORMAL PRACTICES.  AND I DON'T KNOW THAT YOU

10    FOLKS --

11         MS. MANIFOLD:  MR. REIMER'S DEPOSITION WAS NOT

12    FILED UNDER SEAL, I DON'T BELIEVE.

13         MR. RIFKIN:  NO.

14         MS. MANIFOLD:  IT WAS -- IT WAS --

15         MR. RIFKIN:  IT HASN'T BEEN DESIGNATED

16    CONFIDENTIAL.  AND THERE WAS NO REQUEST ON THE RECORD THAT

17    THEY BE GIVEN TIME TO DO THAT.  SO, PURSUANT TO OUR

18    STIPULATED CONFIDENTIALITY ORDER, THAT'S A PUBLIC DOCUMENT.

19         AND THERE'S TWO -- THERE'S TWO TRANSCRIPTS.  HE WAS

20    -- HE WAS -- WHAT HAPPENED WAS AFTER WE SUBPOENAED ASCAP TO

21    PROVIDE --

22         THE COURT:  CAN YOU STAND BY FOR ONE SECOND.

23         MR. RIFKIN:  SURE.

24         (PAUSE IN PROCEEDINGS.)

25         THE COURT:  WELL, 126 IS BOTH A SEALED AND

1  UNDER-SEAL DOCUMENT BECAUSE IT WAS REDACTED.  AND, SO --

2  OKAY.  I SEE WHAT HAPPENED.

3            ALL RIGHT.  I WILL TAKE A LOOK AT IT BEFORE --

4            MR. RIFKIN:  OKAY.  AND THIS IS -- THIS IS DOCUMENT

5  NUMBER 126-3.  IT'S EXHIBIT 14 TO THAT SUPPLEMENTAL

6  DECLARATION.  AND IT'S THE TRANSCRIPT FROM THE SECOND DAY OF

7  MR. REIMER'S DEPOSITION.

8            YOUR HONOR MAY RECALL WHAT HAPPENED WAS ASCAP

9  ORIGINALLY --

10           THE COURT:  RESISTED --

11           MR. RIFKIN:  -- MOVED TO QUASH THE DEPOSITION --

12           THE COURT:  RESISTED.

13           MR. RIFKIN:  THEY -- THEY CONSENTED TO THE

14  DEPOSITION.  AND AFTER 39 MINUTES OF DEPOSITION THE FIRST

15  TIME, THEY REPEATEDLY INSTRUCTED MR. REIMER NOT TO ANSWER

16  QUESTIONS.  WE FILED A MOTION TO COMPEL.  THEY AGAIN

17  ULTIMATELY CONSENTED TO ALLOW HIM TO COME BACK.  HE CAME BACK

18  ON THE 25TH OF JULY.  AND THAT'S EXHIBIT 14, WHICH IS DOCKET

19  NUMBER 126-3.

20           THE COURT:  IT'S ON MY MONITOR RIGHT NOW.

21           MR. RIFKIN:  OKAY.  AND IF YOU TURN TO PAGE 84 OF

22  THE TRANSCRIPT, WHICH I THINK IS PAGE 21 OF 25 OF THE EXHIBIT

23  --

24           THE COURT:  GOT IT.

25           MR. RIFKIN:  -- HE WAS ASKED IF -- HE, IN FACT, TOLD

1   ME BEFORE HE PRODUCED THE DOCUMENTS.  HE CALLED ME.  HE SAID

2   WE'RE PRODUCING ABOUT 500 PAGES OF DOCUMENTS.  AND HE SAID

3   YOU WILL FIND AMONG THEM THE TWO DOCUMENTS YOU WILL FIND

4   EXTREMELY INTERESTING.

5          THE COURT:  OKAY.  SO, HE --

6          MR. RIFKIN:  THEY'RE A DETAILED ANALYSIS OF THE

7   COPYRIGHT.

8          THE COURT:  WE'VE GOT SOME GOOD STUFF FOR YOU.

9          MR. RIFKIN:  THAT'S EXACTLY WHAT HE SAID.

10         THE COURT:  YES.

11         MR. RIFKIN:  AND, SO, WHAT -- WHAT WE WANTED THE

12  COURT TO UNDERSTAND IS MR. REIMER WAS COMPLETELY AWARE OF

13  WHAT HE WAS PRODUCING.  HE KNEW IT WAS IN THE DOCUMENTS.  HE

14  PRODUCED THEM DELIBERATELY.  AND IT'S OUR VIEW THAT THAT

15  REFLECTS HIS JUDGMENT THAT THEY WERE NOT PRIVILEGED.  IF HE

16  THOUGHT THEY WERE PRIVILEGED, HE WOULD NOT HAVE PRODUCED THEM

17  TO US.  THERE WASN'T ANYTHING ACCIDENTAL ABOUT HIS

18  PRODUCTION.  HE MAY NOW REGRET HAVING PRODUCED THEM BECAUSE

19  WARNER HAS SAID THAT THEY REGARD THEM AS PRIVILEGED.

20         THE COURT:  RIGHT.

21         MR. RIFKIN:  BUT WE THINK THAT ASCAP'S

22  UNDERSTANDING OF THOSE DOCUMENTS IS PERHAPS AS IMPORTANT AS

23  WHAT WE'RE NOW TRYING TO SURMISE FROM THE TRANSMITTAL.

24         AND IT JUST SO HAPPENS THAT MR. REIMER IS THE ONLY

25  PERSON WHO WAS AROUND AT THE TIME.  HE'S BEEN AN EMPLOYEE OF

1    ASCAP IN THEIR LEGAL DEPARTMENT SINCE 1971.  HE WAS ACTUALLY

2    THERE WHEN THESE DOCUMENTS WERE SENT BY SUMMY-BIRCHARD, BY

3    MRS. SENGSTACK TO BERNIE CORMAN, WHO WAS GENERAL COUNSEL --

4              THE COURT:  UH-HUM.

5              MR. RIFKIN:  -- OF ASCAP.

6              NOW, HE DIDN'T SAY HE WAS AWARE OF THE DOCUMENTS AT

7    THE TIME.  BUT HE WAS CERTAINLY AWARE OF THEM IN 2014.  AND

8    HE CERTAINLY --

9              THE COURT:  BECAUSE HE PRODUCED THEM IN RESPONSE --

10             MR. RIFKIN:  -- DIDN'T REGARD THEM --

11             THE COURT: -- TO YOUR SUBPOENA.

12             MR. RIFKIN:  CORRECT.

13             THE COURT:  GOT IT.

14             MR. RIFKIN:  AND HE CERTAINLY DIDN'T REGARD THEM AS

15   PRIVILEGED WHEN HE PRODUCED THEM IN 2014.

16             AND WE THINK THAT SHOULD BEAR ON THE COURT'S

17   ATTEMPT TO TRY TO RECONSTRUCT THE PURPOSE FOR THE

18   COMMUNICATION FROM MRS. SENGSTACK IN 1979.  AND THAT IS, YOUR

19   HONOR -- WE THINK THAT IS THE NUB OF THE ISSUE.  BECAUSE WHEN

20   YOU DO STRIP IT ALL AWAY, WE DO AGREE WITH MOST OF WHAT THE

21   COURT HAS SAID, THAT REALLY THIS RELATES TO THE PURPOSE FOR

22   THE COMMUNICATION.  EVEN THE SCHWARTZ CASE THAT THE

23   DEFENDANT'S CITE FOR THE PRINCIPLE THAT THE IN-HOUSE COUNSEL

24   FOR A TRADE ASSOCIATION THAT REPRESENTS A HALF A MILLION

25   MEMBERS NOW AND OVER A HUNDRED THOUSAND MEMBERS AT THE TIME

1   IS ALSO THE LAWYER FOR EVERY ONE OF THEM.  EVEN THAT CASE

2   SAYS THAT IT ONLY SERVES AS A MEMBER TO THE EXTENT THAT --

3   IT'S ONLY SERVES AS COUNSEL FOR THE MEMBER TO THE EXTENT THAT

4   THE MEMBER IS SEEKING LEGAL ADVICE.

5           THE COURT:  UH-HUH.

6           MR. RIFKIN:  SO, WHETHER YOU -- WHETHER YOU LOOK AT

7   THIS UNDER THE RUBRIC OF DID BERNIE CORMAN, ASCAP'S GENERAL

8   COUNSEL, REPRESENT SUMMY IN 1979, THE QUESTION IS WAS SUMMY

9   ASKING FOR MR. CORMAN'S LEGAL ADVICE.

10          AND WE SUBMIT THAT THE DEFENDANTS CAN'T POSSIBLY

11  SUSTAIN THAT BURDEN IN LIGHT OF THE UNDISPUTED FACTS.  AND

12  THE PRINCIPAL UNDISPUTED FACTS ARE AS FOLLOWS:

13          NUMBER ONE, THE LETTER THAT MRS. SENGSTACK WROTE TO

14  MR. CORMAN IN 1979 DIDN'T ASK FOR LEGAL ADVICE, DIDN'T

15  SOLICIT LEGAL ADVICE, DIDN'T IDENTIFY THE COUDERT LETTERS AS

16  PRIVILEGED, DIDN'T ASSERT THAT THEY WERE TO BE PRIVILEGED,

17  DIDN'T REFER TO ANY ACTUAL, CONTEMPLATED, ANTICIPATED OR ANY

18  OTHER LITIGATION, DIDN'T MENTION ANY COMMON LEGAL ENTERPRISE

19  BETWEEN THEM.

20          AND AS IMPORTANT, THERE IS NO RESPONSE, ZERO, NONE,

21  FROM ASCAP THAT ASCAP EVER PROVIDED LEGAL ADVICE, EVER

22  RENDERED LEGAL ADVICE TO SUMMY-BIRCHARD, EVER USED THOSE

23  DOCUMENTS IN ANY WAY TO FURTHER THE INTERESTS OF

24  SUMMY-BIRCHARD.  ZERO.  NOTHING.  NOT A SINGLE THING.

25          ASCAP HAS NOT EVER SOUGHT TO ENFORCE A COPYRIGHT TO

1    "HAPPY BIRTHDAY," NOT IN THE 40 YEARS SINCE THAT LETTER WAS

2    SENT AND NOT IN THE 40 YEARS BEFORE IT WAS SENT.  IT HAS

3    NEVER HAPPENED.

4            THE COURT:  HOW IS THAT RELEVANT?

5            MR. RIFKIN:  BECAUSE I THINK THE SUGGESTION THAT

6    WHAT HAPPENED IN 1979 WAS PERHAPS BECAUSE THERE MIGHT BE A

7    TIME WHEN ASCAP MIGHT BE CALLED UPON TO ENFORCE A COPYRIGHT

8    TO "HAPPY BIRTHDAY" -- MAYBE -- I THINK JUST FLIES IN THE

9    FACE OF NOT ONLY THE PARTICULAR FACTS OF THE LETTER, THAT IS,

10   MRS. SENGSTACK'S LETTER TO MR. CORMAN, BUT ALSO THE 80-YEAR

11   HISTORY SINCE THE TIME THE SONG WAS -- AND I'LL LOOSELY SAY

12   THIS -- COPYRIGHTED IN 1935 --

13           THE COURT:  YOU'RE NOT WAIVING ANYTHING BY --

14           MR. RIFKIN:  -- TO TODAY.

15           THE COURT:  DON'T WORRY ABOUT THAT.

16           MR. RIFKIN:  AND WE DO DISAGREE WITH WHETHER THERE

17   WAS A COPYRIGHT OR NOT.

18           YOUR HONOR, INTERESTINGLY YOU SAID, AND I MADE A

19   NOTE OF THIS, YOUR HONOR SAID, AT THE TIME IN 1979 MRS.

20   SENGSTACK OR SUMMY-BIRCHARD COULD HAVE SENT, FOR EXAMPLE, A

21   COMFORT LETTER -- MAYBE FROM COUDERT OR FROM SOMEBODY ELSE,

22   MAYBE FROM THEIR OWN IN-HOUSE COUNSEL IF THEY HAD SOMEONE

23   LIKE THAT -- ASSERTING THAT THE COPYRIGHT WAS PROTECTED.

24           AND YOUR HONOR KNOWS FROM SOME OF THE CASES THAT

25   WE'VE CITED TO YOU THAT THERE ARE INSTANCES WHERE ASCAP GETS

1    INTO A DISPUTE BETWEEN MEMBERS.  AND IN THAT CASE ASCAP SAYS,

2    LOOK, WE DON'T KNOW WHO HAS THE RIGHT TO WHAT SONG.  WE

3    REALLY DON'T KNOW.  WE CAN'T DECIDE THAT.  WHAT WE WANT TO DO

4    IS WE WANT YOU TO INDEMNIFY US IN THE EVENT IT TURNS OUT THAT

5    YOU'RE WRONG.  AND ASCAP CERTAINLY COULD HAVE SOUGHT THAT

6    INDEMNIFICATION FROM SUMMY.

7         BUT ONE OF THE THINGS THAT I WROTE DOWN THAT I

8    THOUGHT WAS REALLY VERY INTERESTING IS ASCAP COULD HAVE --

9    I'M SORRY, SUMMY COULD HAVE SENT A COPY OF THE COPYRIGHT.  I

10   MEAN, WHAT BETTER PROOF WOULD THERE BE OF THE EXISTENCE OF A

11   COPYRIGHT IN A SONG THAN THE COPYRIGHT.

12        THEY DIDN'T DO THAT.  WE THINK THAT'S RELEVANT.  IT

13   CERTAINLY SUGGESTS TO US -- AND, AGAIN, PUT IN THE CONTEXT OF

14   THE FACT THAT MRS. SENGSTACK WROTE TO MR. CORMAN THREE YEARS

15   AFTER SHE GOT THE DETAIL ANALYSIS.  THE LONG, LENGTHY LETTER

16   FROM COUDERT WAS 1976.  THE SUBSEQUENT LETTER, THE 1978

17   LETTER WAS A FOLLOW-UP LETTER.

18        BUT THERE'S NO INDICATION THAT IN THAT INTERVENING

19   THREE-YEAR PERIOD OF TIME ASCAP WAS INVOLVED AT ALL IN THE

20   DISPUTE OVER THE COPYRIGHT TO "HAPPY BIRTHDAY."  THIS IS A

21   DISPUTE THAT HAS BEEN SIMMERING FOR YEARS.

22        THE COURT:  BUT THERE WAS -- THERE IS --

23        MR. RIFKIN:  COUDERT'S LETTER DIDN'T COME OUT OF

24   THE BLUE.

25        THE COURT:  EXCUSE ME.  THERE IS A REFERENCE IN MS.

1    SENGSTACK'S -- STENGSTACK'S, SORRY.

2              MR. RIFKIN:  SENGSTACK.

3              THE COURT:  SENGSTACK.

4              THERE IS A REFERENCE IN HER LETTER TO A PRIOR

5    DISCUSSION WITH THE LAWYER.

6              SO, YOU ENTIRELY HAVE ME ON SORT OF THE PROFORMA

7    NATURE OF WHAT THE TRANSMITTAL LETTER SAYS.  YOU'RE

8    ABSOLUTELY RIGHT.  IT DOES NOT HAVE THINGS THAT WOULD PERHAPS

9    MORE CONCLUSIVELY DEMONSTRATE AN INTENTION TO ASSERT A

10   PRIVILEGE OR A REQUEST FOR A PROTECTIVE.  YOU'RE ABSOLUTELY

11   RIGHT.

12             MR. RIFKIN:  SURE.

13             THE COURT:  AND THAT DOES WEIGH -- THAT DOES WEIGH

14   AGAINST WARNER.  I AM COMPLETELY ON BOARD.

15             I'M A LITTLE -- AND I DON'T MEAN TO CUT YOU OFF,

16   BUT I THINK, AGAIN, IT'S KIND OF FAIR TO HAVE A DIALOGUE.

17   I'M NOT PARTICULARLY SWAYED BY THE FACT THAT THERE WAS NO

18   LITIGATION AFTERWARDS.  I GO TO MY LAWYER TODAY.  AND I SAY I

19   THINK I'M GOING TO BE SUED, AND THE LAWYER SAYS LET'S TALK.

20   AND WE HAVE A DISCUSSION.  AND THEN AFTERWARDS I'M NOT SUED.

21   THAT DOESN'T MEAN YEARS FROM NOW SOMEONE IS GOING TO SAY,

22   WELL, BACK WHEN YOU TALKED WITH YOUR LAWYER YOUR PRIVILEGE

23   DOESN'T APPLY.  THE QUESTION IS AT THE TIME DID I HAVE A

24   REASON TO BELIEVE THAT I NEEDED ADVICE.

25             AND I'M A LITTLE -- I'M A LITTLE TROUBLED BY

1  EX-POST EXPLANATION OF THE CIRCUMSTANCES.

2        MR. RIFKIN:  I UNDERSTAND THAT.  AND I DON'T -- I

3  DON'T -- I DON'T THINK IN THIS CASE -- I DON'T THINK YOU

4  WOULD -- YOU WOULD NEED TO LOOK ONLY AT THE FUTURE.  IN OTHER

5  WORDS, ONLY LOOK FROM 1979 TO THE PRESENT, THOSE 40 YEARS.

6  BUT I THINK YOU NEED TO PUT THOSE 40 YEARS IN THE SCALE WHEN

7  YOU LOOK BACK AT THE 40 YEARS BEFORE IT.  BECAUSE IN THE 40

8  YEARS BEFORE IT, THERE WAS NEVER A LAWSUIT FILED UNDER THE

9  COPYRIGHT -- NEVER, EVER, EVER.

10        THERE'S NEVER BEEN -- I JUST WANT THE COURT TO

11  UNDERSTAND.  IN THE 80 YEARS SINCE THE SONG "HAPPY BIRTHDAY

12  TO YOU" WAS PURPORTEDLY COPYRIGHTED, NOT A SINGLE OWNER --

13  AND IT HAS PASSED THROUGH MANY HANDS -- NOT A SINGLE OWNER

14  HAS EVER SUED ANYONE FOR INFRINGING ANY COPYRIGHT TO THE SONG

15  "HAPPY BIRTHDAY TO YOU."

16        IN THE FIVE INSTANCES -- AND THIS IS I THINK

17  IMPORTANT -- IN THE FIVE INSTANCES WHEN THERE HAVE BEEN

18  INFRINGEMENT LAWSUITS OVER PUBLIC PERFORMANCES OF THE SONG

19  "HAPPY BIRTHDAY TO YOU" WITHOUT THE PERMISSION OF THE

20  SO-CALLED OWNER, IN EACH AND EVERY ONE OF THOSE INSTANCES THE

21  ONLY COPYRIGHT THAT WAS EVER ASSERTED WAS THE 1893 COPYRIGHT

22  TO A PREDECESSOR SONG "GOOD MORNING TO ALL."  ALL FIVE OF

23  THOSE CASES WERE -- I'M SORRY, FOUR OF THOSE FIVE CASES WERE

24  COMMENCED AFTER THE OWNER PURPORTEDLY FILED A COPYRIGHT TO

25  "HAPPY BIRTHDAY TO YOU."

1       AND IN ALL FOUR OF THOSE CASES FILED AFTER THE

2   COPYRIGHT WAS FILED THEY DID NOT RELY ON THE COPYRIGHT TO

3   "HAPPY BIRTHDAY TO YOU" AS ONE MIGHT SUSPECT, BUT THEY

4   RELIED ON THE COPYRIGHT TO A -- A THEN 60-YEAR-OLD SONG,

5   "GOOD MORNING TO ALL."  I THINK THAT'S INCREDIBLY

6   INFORMATIVE.  AND I THINK IT SHOULD EXPLAIN TO THE COURT THAT

7   THERE HAS NEVER BEEN AN INSTANCE WHEN ANYONE WAS EVER GOING

8   TO SUE UNDER THIS COPYRIGHT.  IT HASN'T HAPPENED EVER.  NOT

9   ONCE EVER HAS ANYONE EVER SUED ANYONE FOR INFRINGING THE

10  COPYRIGHT TO THE SONG "HAPPY BIRTHDAY TO YOU," WHICH AS YOUR

11  HONOR KNOWS IS THE SUBJECT OF THE COUDERT LETTERS.

12      SO, I THINK TO SURMISE AS THE DEFENDANTS REALLY

13  HAVE TO -- I THINK TO SURMISE THAT THERE WAS SOME RISK THAT

14  THERE MIGHT BE SOME DAY SOME LITIGATION THAT ASCAP MIGHT BE

15  ASKED TO BRING ON BEHALF OF SUMMY-BIRCHARD IN 1979 REALLY

16  STRETCHES THE TRUTH.  AND I DON'T MEAN THAT THE DEFENDANTS

17  ARE STRETCHING THE TRUTH.  WHAT I MEAN IS IT STRETCHES WHAT

18  WE KNOW THE FACTS TO BE.

19      THE COURT:  OKAY.

20      MR. RIFKIN:  I'M NOT SUGGESTING THAT THEY'RE

21  DISTORTING THE FACTS AT ALL.  FAR BE IT FROM ME TO SAY THAT.

22  WHAT I AM SAYING, THOUGH, IS THEY ARE ASKING YOU TO MAKE AN

23  ENORMOUS LEAP FROM WHAT WE ALL KNOW THE REAL HARD FACTS ARE

24  TO CONCLUDE FROM A COVER LETTER THAT DOESN'T ASK FOR LEGAL

25  ADVICE, DOESN'T SOLICIT LEGAL ADVICE, ISN'T IN RESPONSE TO A

1    COMMUNICATION REQUESTING INFORMATION FOR THE PROVISION OF

2    LEGAL ADVICE, ISN'T MET WITH LEGAL ADVICE, DOESN'T RESULT IN

3    ANY LEGAL ACTION OR ANY LEGAL ADVICE BEING TAKEN.  I THINK

4    THAT'S PRETTY POWERFUL EVIDENCE THAT THERE REALLY WASN'T MUCH

5    OF A RISK HERE.

6            BUT IN ADDITION TO THAT, EVEN IF WE WERE GOING TO

7    PUT ALL THOSE FACTS ASIDE, WE HAVE A CASE LIKE THE TERRA NOVA

8    CASE THAT WE DISCUSSED IN OUR BRIEF WHERE THE COURT SAYS IN

9    THE BANK OF AMERICA VERSUS TERRA NOVA CASE IT'S NOT ENOUGH

10   THAT YOU'RE TRYING TO STRUCTURE A COMMERCIAL RELATIONSHIP IN

11   A WAY THAT AVOIDS SOME FUTURE LITIGATION.  AND MAYBE YOU

12   MIGHT SAY HERE THAT ASCAP HAD AN INTEREST IN KNOWING THAT IF

13   ASCAP WAS COLLECTING FEES ON THE COPYRIGHT TO "HAPPY

14   BIRTHDAY," ASCAP MIGHT HAVE AN INTEREST IN THAT.

15           BUT THE MERE FACT THAT THE PARTIES ARE TRYING TO

16   STRUCTURE A BUSINESS RELATIONSHIP IN A, QUOTE, LEGAL WAY IS

17   NOT THE KIND OF LEGAL INTEREST THAT WE'RE TALKING ABOUT WHEN

18   WE LOOK AT THIS QUESTION OF THE COMMON INTEREST.  AND WE

19   CITED THAT CASE.  WE DISCUSSED IT AT LENGTH IN OUR BRIEF.

20   IT'S THE BANK OF AMERICA VERSUS TERRA NOVA FROM THE SOUTHERN

21   DISTRICT OF NEW YORK IN 2002.

22           I THINK THE ANSWER IS REALLY LOOK AT WHAT -- LOOK

23   AT WHAT ASCAP HAS SAID OVER THE YEARS.  MR. REIMER SAYS THEY

24   DON'T HAVE ANY INTEREST IN THE COPYRIGHT.  MR. REIMER SAYS

25   THEY DON'T HAVE ANY INTEREST IN THE ROYALTIES.  THEY DO

41

1    COLLECT A FEE FOR THE SERVICE THEY PROVIDE, BUT IT'S -- IT'S

2    NOT AN INTEREST IN EITHER OF THE PROPERTY -- THAT IS, THE

3    COPYRIGHTS OR THE ROYALTIES DERIVED FROM THEM.  IT'S JUST A

4    FEE FOR THE SERVICES THEY RENDER.  WHEN -- AND WE'VE CITED A

5    COUPLE OF CASES.

6              WE CITE -- I CALL IT THE SPRINGSTEIN CASE BECAUSE I

7    CAN'T REMEMBER THE PERFORMER -- OCASEK.  HE MAY BE MORE

8    FAMOUS THAN I'M GIVING HIM CREDIT FOR.  BUT SPRINGSTEIN WAS

9    ONE OF THE PLAINTIFFS IN THAT CASE.  THEY SUED A BAR OWNER

10   FOR PERFORMING THEIR RIGHTS.  AND THE BAR OWNER TRIED TO JOIN

11   ASCAP IN THE LITIGATION.  AND ASCAP MOVED TO BE DISMISSED.

12   THEY MOVED TO HAVE THE THIRD-PARTY COMPLAINT DISMISSED.

13             AND THEIR ARGUMENT THERE WAS WE DON'T HAVE ANY

14   INTEREST IN THESE COPYRIGHTS.  WE DON'T WANT TO BE A PARTY TO

15   THIS LITIGATION.  WE DON'T NEED TO BE A PARTY TO THIS

16   LITIGATION.  YOU SHOULDN'T JOIN US.  YOU DON'T HAVE A CLAIM

17   AGAINST US, A CLAIM AGAINST US.  WE ARE STRANGERS TO THIS.

18   AND, SO, THAT'S WHAT THE COURT DID.  THE COURT LET ASCAP OUT

19   ON ASCAP'S MOTION.

20             AND I THINK THAT THOSE CASES -- THERE WAS ANOTHER

21   CASE, THE DOORS CASE -- ALMOST EXACTLY THE SAME FACTS, ONE

22   DECIDED IN 1987 AND THE OTHER DECIDED IN 1992.

23             THE COURT:  ALL RIGHT.  WELL, DON'T SHORT FORM

24   THEM.

25             THE SPRINGSTEIN CASE WAS WHICH ONE?

1          MR. RIFKIN:  I'M SORRY.  THE <u>SPRINGSTEIN</u> CASE IS --

2   IS <u>OCASEK</u>, O-C-A-S-E-K.  IT'S THE WYOMING CASE THAT'S DECIDED

3   IN 1987.  AND IT WAS A -- IT WAS AN ACTION --

4          THE COURT:  WHERE IS THAT -- WHERE IS THAT CITED IN

5   YOUR BRIEF?

6          MR. RIFKIN:  YOUR HONOR, IT'S IN THE REPLY.

7          THE COURT:  AHH.

8          MR. RIFKIN:  OKAY.  THAT WAS RECENTLY FILED.

9   OBVIOUSLY, YOU PROBABLY HAVEN'T HAD A CHANCE TO READ THE

10  SUPPLEMENTAL BRIEF THAT WE FILED --

11         THE COURT:  OH, I DID.

12         MR. RIFKIN:  -- ON THE 22ND.

13         THE COURT:  I DID.  I DID.  I DID.  I READ

14  EVERYTHING.

15         MR. RIFKIN:  UH-HUM.

16         IT'S -- IT APPEARS ON PAGE 9 OF OUR BRIEF, YOUR

17  HONOR, OF OUR SUPPLEMENTAL BRIEF.  IT'S <u>OCASEK VERSUS</u>

18  <u>HEGGLUND</u>.

19         THE COURT:  YES.

20         MR. RIFKIN:  HEGGLUND WAS A BAR OWNER.  AND --

21         THE COURT:  GOT IT.  GOT IT.

22         MR. RIFKIN:  -- WHAT THE COURT SAID --

23  INTERESTINGLY, THERE WAS TWO THINGS.  IT SAYS, FIRST OF ALL,

24  ASCAP IS NOT -- IN THE STRICTEST SENSE, IT IS NOT A LICENSING

25  AGENT OF ANY OF THE MEMBERS BECAUSE -- AND I THOUGHT THIS WAS

1    VERY INTERESTING -- BECAUSE THE LICENSES THAT ASCAP ISSUES

2    ARE LICENSES IN ASCAP'S OWN NAME TO THE USERS OF THE MUSIC.

3    SO, IN THIS CASE IT WAS A BAR.  BUT IT COULD BE A RADIO

4    STATION.  IT COULD BE A HOTEL LOBBY.  IT COULD BE AN AIRPORT,

5    WHATEVER.

6            SO, THE COURT SAYS IT'S NOT REALLY AN AGENT BECAUSE

7    IT DOESN'T ISSUE LICENSES IN THE NAME OF THE PRINCIPAL, THAT

8    IS, THE OWNERS OF THE MUSIC.  AND IT SAYS EVEN IF IT WAS AN

9    AGENT, IT STILL HAS NO INTEREST IN THE COPYRIGHTS OR THE

10   VALIDITY OF THE COPYRIGHTS.

11           AGAIN, MR. REIMER TESTIFIED ON THE 22ND OF JULY.

12           THE COURT:  UH-HUM.

13           MR. RIFKIN:  I ASKED HIM IF ASCAP HAS EVER BEEN

14   INVOLVED IN ANY LITIGATION REGARDING THE VALIDITY OF ANY

15   COPYRIGHT.  AND HE LOOKED AT ME.  AND HE SAID, WELL, NO, OF

16   COURSE NOT.  WHY WOULD WE BE.  WE HAVE NO INTEREST IN THAT.

17   THAT'S FOR THE -- THAT'S FOR THE MEMBERS TO WORRY ABOUT.

18           SO, WHEN WE HAVE ALL OF THE RELEVANT FACTS I THINK

19   IN THE BASKET IN FRONT OF US, AND WE LOOK AND WE SAY, WELL,

20   WHAT IS THERE ABOUT THIS LETTER FROM MRS. SENGSTACK THAT

21   MAKES US THINK THAT SHE WAS REQUESTING LEGAL ADVICE OR

22   THOUGHT THAT BERNIE CORMAN WAS HER LAWYER.

23           AND WE LOOK AT SOME OF THE FACTORS THE COURTS HAVE

24   CONSIDERED RELEVANT.  IT JUST -- THERE'S NOT ENOUGH HERE FOR

25   THE DEFENDANTS TO MEET THEIR BURDEN IN LIGHT OF WHAT ARE

44

1  REALLY OVERWHELMING HISTORICAL FACTS THAT ASCAP HASN'T HAD

2  ANYTHING TO DO WITH THE "HAPPY BIRTHDAY" COPYRIGHT.  I THINK

3  THE FAR MORE PLAUSIBLE CONCLUSION FROM THIS IS THAT MRS.

4  SENGSTACK HAD A CASUAL CONVERSATION WITH BERNIE CORMAN AND

5  MENTIONED THAT SHE HAD THIS ANALYSIS DONE.

6          AS YOUR HONOR KNOWS, THE "HAPPY BIRTHDAY" COPYRIGHT

7  HAS BEEN SOMETHING OF A DISPUTE IN THE MUSIC BUSINESS --

8          THE COURT:  WELL, I THOUGHT YOU WERE GOING TO USE A

9  BETTER WORD THAN THAT.  OKAY.

10          MR. RIFKIN:  NO.  I'VE REFRAINED FROM DOING SO,

11  YOUR HONOR.  BUT YOU CAN IMAGINE A MORE COLORFUL WORD FOR

12  DISPUTE.

13          THE COURT:  HAVE --

14          MR. RIFKIN:  IT'S BEEN SOMETHING OF A DISPUTE --

15          THE COURT:  HAVE AT IT.

16          MR. RIFKIN:  -- IN THE MUSIC BUSINESS FOR DECADES.

17          AND I THINK IT'S FAR MORE PLAUSIBLE THAT MRS.

18  SENGSTACK SIMPLY SENT IT TO MR. CORMAN AS A COURTESY.

19  THERE'S NOTHING -- AND, AGAIN, THIS IS -- AS YOUR HONOR SAID

20  AT THE VERY BEGINNING, THIS IS THE DEFENDANT'S BURDEN TO

21  CONVINCE THE COURT THAT SUMMY-BIRCHARD REGARDED ASCAP AS ITS

22  LAWYER OR WAS COMMUNICATING INVOLVING A COMMON LEGAL

23  ENTERPRISE.

24          AND WHEN YOU LOOK AT THE TOTALITY OF THE FACTS THAT

25  WE REALLY KNOW EXISTED, AND YOU COMPARE IT TO THE PAUCITY OF

45

1    EVIDENCE THAT SUGGESTS THE CONTRARY -- UNLIKE ALL THE OTHER

2    CASES WHERE -- AND I AGREE THAT THEY'RE MORE TEMPORALLY

3    RELATED TO THE TIME IN QUESTION -- WHERE THERE ARE AFFIDAVITS

4    OR DECLARATIONS OR EVEN TESTIMONY FROM PARTICIPANTS IN THE

5    MEETINGS WHO SAY, YES, ALL THE LAWYERS WERE THERE; YES, WE

6    TALKED WITH ONE ANOTHER; YES, THERE WERE MANY CLIENTS THERE

7    FROM DIFFERENT COMPANIES.

8         THE CIRCUMSTANCES OBVIOUSLY SUGGEST SOME EITHER

9    ATTORNEY-CLIENT RELATIONSHIP OR SOME EXPECTATION THAT THERE

10   WAS THIS COMMON LEGAL ENTERPRISE THAT THE PARTIES SHARED EVEN

11   THOUGH THEY'RE STRANGERS TO ONE ANOTHER OTHERWISE.

12        BUT -- BUT THAT JUST DOESN'T EXIST HERE GIVEN THE

13   RELATIONSHIP THAT ASCAP HAS DESCRIBED FOR ITSELF.  AND, SO,

14   FOR EXAMPLE, WHEN ASCAP IN THE -- ONE OF THE RATE PROCEEDINGS

15   IN THE SECOND CIRCUIT IN THE PANDORA MATTER, WHEN ASCAP SAYS

16   THAT THE PRODUCERS -- THAT ASCAP HAS SOME INTEREST IN THE

17   SONGS, THE PRODUCERS JUMP IN.  AND THEY WRITE A LETTER TO THE

18   COURT.  AND THEY SAY, TO BE CLEAR, OUR CLIENTS, THE MUSIC

19   PRODUCERS, NOT ASCAP, ARE THE COPYRIGHT OWNERS OF THE SONGS

20   IN QUESTION, POSSESSED OF EXCLUSIVE RIGHTS UNDER SECTION 106

21   OF THE COPYRIGHT ACT WHICH INCLUDE THE EXCLUSIVE RIGHT TO

22   PUBLICLY PERFORM THE SONGS OR TO AUTHORIZE OTHERS TO DO SO.

23        THIS WAS -- AND I'M NOW QUOTING FROM THE IN RE

24   PANDORA MEDIA CASE.  THIS IS THE --

25        THE COURT:  AND YOU HAVE THE SAME STATEMENT IN HIS

1   DECLARATION IN --

2            MR. RIFKIN:  THE EXACT SAME STATEMENT --

3            THE COURT:  YES.

4            MR. RIFKIN:  -- IN THE DECLARATION.  AND, FRANKLY,

5   IN HIS DEPOSITION TESTIMONY ON JULY 22ND.

6            YOU KNOW, I -- WE ARE STRUGGLING BECAUSE WE ARE

7   LOOKING BACK 40-SOME-ODD YEARS.  AND WE'RE TRYING TO FIGURE

8   OUT WHAT MRS. SENGSTACK THOUGHT WHEN SHE DID WHAT SHE DID.

9   AND I THINK HERE --

10           THE COURT:  AND I PRESUME SHE'S NOT IN A POSITION

11  TO TESTIFY.

12           MR. RIFKIN:  I -- NOT THAT I'M AWARE OF, YOUR

13  HONOR.

14           THE COURT:  OKAY.  THAT'S FINE.

15           MR. RIFKIN:  I DON'T BELIEVE THAT IS THE CASE AT

16  ALL.

17           THE COURT:  OKAY.

18           MR. RIFKIN:  WHAT -- WHEN WE LOOK AT WHAT SHE DID,

19  WHICH IS TO SEND A LETTER THREE YEARS LATER THAT WAS DONE BY

20  HER OWN COUNSEL TO AN ORGANIZATION THAT HAS AT BEST A

21  CONTRACTUAL RELATIONSHIP WITH ITS MEMBERS, AND WE LOOK AT

22  WHAT HAPPENED IN THE 40 YEARS BEFORE THAT AND THE 40 YEARS

23  AFTER THAT, AND WE LOOK AT WHAT ASCAP SAYS IS THE LIMITED

24  ROLE IT HAS AND WHETHER IT HAS ANY INTEREST IN THE

25  COPYRIGHTS, WHETHER IT HAS PARTICIPATED IN ANY OTHER --

47

1    FORGET "HAPPY BIRTHDAY" -- WHETHER IT HAS PARTICIPATED IN ANY

2    OTHER LITIGATION INVOLVING THE VALIDITY OF ANY OTHER

3    COPYRIGHTS.

4           I THINK IT'S A STRETCH TO SAY THAT -- THAT ASCAP

5    AND SUMMY-BIRCHARD SHARED A COMMON LEGAL INTEREST OR WERE

6    INVOLVED IN A COMMON LEGAL ENTERPRISE CONCERNING "HAPPY

7    BIRTHDAY TO YOU."  WHAT THEY WERE WERE BUSINESS PARTNERS.

8           AND YOUR HONOR IS CORRECT.  WE'VE CITED A NUMBER OF

9    CASES, INCLUDING THE NIDEC CASE, THAT SAYS A BUSINESS

10   INTEREST ISN'T SUFFICIENT.  IT HAS TO BE AN INTEREST IN A

11   LEGAL MATTER.

12          AND THE MERE POSSIBILITY -- THE REMOTE POSSIBILITY

13   THAT SOMEHOW HISTORY WOULD CHANGE ITSELF AFTER 40 YEARS.  AND

14   ALL OF A SUDDEN ASCAP WOULD FOR SOME STRANGE REASON FIND

15   ITSELF IN LITIGATION INVOLVING THE VALIDITY OF THE COPYRIGHT

16   TO "HAPPY BIRTHDAY TO YOU" WHEN IT HAS NEVER LITIGATED THE

17   VALIDITY OF A COPYRIGHT TO ANY OTHER INDIVIDUAL SONG EVER --

18   NOT BEFORE.  NOT SINCE.  I THINK THAT'S JUST -- GOES TOO FAR

19   GIVEN THE FACT THAT THE BURDEN IS ON THE DEFENDANTS.

20          IF THE BURDEN WERE OURS, WE WOULD HAVE A MUCH

21   DIFFERENT ARGUMENT AND FRANKLY A MUCH MORE DIFFICULT

22   ARGUMENT.  WE WOULD BE IN A POSITION THAT THE DEFENDANTS ARE

23   IN NOW.

24          BUT SINCE THE BURDEN IS ON THEM, THEY NEED TO COME

25   FORWARD WITH SOMETHING MORE THAN JUST SUPPOSITION OR A MERE

48

1   POSSIBILITY, WHICH IS REALLY ALL THEY CAN OFFER THAT FRANKLY

2   FLIES IN THE FACE OF WHAT WE ALL KNOW TO BE THE HISTORICAL

3   FACTS.

4           THE COURT:  OKAY.

5           MR. RIFKIN:  SO, FOR THOSE REASONS, I THINK IN

6   LIGHT OF EVERYTHING YOUR HONOR SAID, I WOULD URGE YOU TO

7   CONSIDER ALL THOSE FACTS IN THE CONTEXT OF THE LEGAL

8   FRAMEWORK THAT I THINK YOUR HONOR DOES UNDERSTAND.

9           MRS. SENGSTACK HAD TO THINK THAT MR. CORMAN WAS HER

10  LAWYER, EVEN THOUGH THERE'S NO INDICATION THAT HE WAS EVER

11  HER LAWYER BEFORE.  THERE'S NO INDICATION THAT SHE SOUGHT

12  LEGAL ADVICE FROM HIM.  THERE'S NO INDICATION HE PROVIDED

13  LEGAL ADVICE TO HER -- AND BY HER I MEAN OBVIOUSLY

14  SUMMY-BIRCHARD.

15          THE COURT:  I'M WITH YOU.  I'M WITH YOU.

16          MR. RIFKIN:  SUMMY-BIRCHARD HAD ITS OWN COUNSEL,

17  COUDERT BROTHERS.

18          THE COURT:  YEP.

19          MR. RIFKIN:  WHICH OVER THE COURSE OF TWO YEARS

20  RENDERED EXHAUSTIVE LEGAL ADVICE ON THE ISSUE.  THERE'S NO --

21  THERE'S NOTHING IN THE RECORD THAT SAYS THAT MRS. SENGSTACK

22  TOLD MR. CORMAN KEEP THIS CONFIDENTIAL.  IN 2014 MR. REIMER

23  PRODUCED THE DOCUMENT --

24          THE COURT:  SO, DO YOU -- DO YOU HAVE -- OKAY.  SO,

25  YOU MAKE A VERY WELL-ARTICULATED EXPLANATION AS TO WHY THOSE

49

1   THINGS DID NOT OCCUR.

2         MR. RIFKIN:  RIGHT.

3         THE COURT:  DO YOU WANT TO GIVE ME SOMETHING TO

4   HANG ON TO AS TO WHY SHE DID PROVIDE INFORMATION THAT SHE

5   PAID A HECK OF A LOT OF MONEY FOR FROM COUDERT, WHY SHE WOULD

6   HAVE BEEN IN THE POSITION TO GIVE THIS TO ASCAP.  WHY?

7         MR. RIFKIN:  I THINK THEY HAPPENED TO BUMP INTO

8   EACH OTHER.  AND I THINK THEY PROBABLY TALKED ABOUT THE SONG

9   BECAUSE PEOPLE IN THE MUSIC BUSINESS TALK ABOUT THE SONG A

10  LOT.  IT IS -- AS I'VE TRIED TO BE KIND TO SAY IT IS A MATTER

11  OF SOME NOTORIETY --

12        THE COURT:  I'VE SUNG IT MYSELF.

13        (LAUGHTER.)

14        MR. RIFKIN:  WITHIN THE MUSIC BUSINESS, IT IS --

15  YOUR HONOR, YOU KNOW, NOT A MONTH GOES BY THAT I DON'T HEAR

16  SOME HUMOROUS REFERENCE TO IT.  I THINK THE LAST TIME I SAW

17  IT WAS NOT A FEW WEEKS AGO ON THE COLBERT SHOW WHEN HE SANG

18  "HAPPY BIRTHDAY" TO HAPPY BIRTHDAY ON HAPPY BIRTHDAY'S HAPPY

19  BIRTHDAY.  AND HE COULDN'T SING THE SONG.

20        IT IS -- IT IS TRULY A MATTER OF SOME ATTENTION IN

21  THE INDUSTRY.

22        THE COURT:  OKAY.

23        MR. RIFKIN:  I THINK IT IS --

24        THE COURT:  OKAY.  SO --

25        MR. RIFKIN:  IT IS -- IT WAS SUMMY'S BIGGEST

1   PROPERTY BY FAR.  IF CORMAN HAPPENED TO BUMP INTO ARLENE

2   SENGSTACK ANYWHERE -- AND SINCE THEY WERE BOTH IN THE MUSIC

3   BUSINESS, IT'S LIKELY THAT THEY DID -- IT'S ALSO LIKELY THAT

4   THE TOPIC OF "HAPPY BIRTHDAY" CAME UP.  IT'S LIKE THE OLD

5   JOKE ABOUT TWO FLIES.  IF YOU SEE TWO FLIES FLYING AROUND

6   TOGETHER YOU KNOW WHAT THEY'RE TALKING ABOUT.  MAYBE THAT'S A

7   FARM JOKE, BUT YOU'LL FORGIVE ME.  MY WIFE IS A HORSE RIDER.

8   SO, I SPEND SOME TIMES ON HORSE FARMS.

9            (LAUGHTER.)

10           MR. RIFKIN:  I THINK IF THEY BUMPED INTO ONE

11  ANOTHER --

12           THE COURT:  OKAY.  I MEAN, YOU KNOW, YOU SAID IT

13  WAS GRATUITOUS.  I COULDN'T --

14           MR. RIFKIN:  I THINK IT WAS GRATUITOUS.

15           THE COURT:  I COULDN'T PLAUSIBLY IMAGINE HOW

16  SOMEONE WOULD GRATUITOUSLY SAY, HEY, WOULD YOU LIKE TO SEE

17  WHAT MY LAWYER SAYS ABOUT THIS SONG.  AND YOU'VE GIVEN ME --

18           MR. RIFKIN:  I --

19           THE COURT:  LOOK, IT'S SPECULATION.  I GOT IT.

20           MR. RIFKIN:  IT DIDN'T COME OUT OF THE BLUE.

21           THE COURT:  OKAY.

22           MR. RIFKIN:  I THINK --

23           THE COURT:  OKAY.

24           MR. RIFKIN:  I THINK THERE'S A CONTEXT TO IT.  I

25  THINK THE CONTEXT IS -- AGAIN, AS I SAY, ALL THE HISTORICAL

51

1    SIGNIFICANCE.  AND LET'S NOT FORGET WHAT WE'RE TALKING ABOUT.

2     WE'RE TALKING ABOUT A UNIQUE SONG.  I MEAN, IT IS "HAPPY

3    BIRTHDAY."  AND IT WAS SUMMY'S BIGGEST PROPERTY.  AND I THINK

4    IT'S ENTIRELY LIKELY THAT CORMAN SAID SOMETHING TO SENGSTACK

5    ABOUT IT.  AND SENGSTACK SAYS, YOU KNOW, HERE'S A COUPLE OF

6    LETTERS WE GOT FROM -- FROM OUR LAWYER THREE YEARS AGO.

7              THE COURT:  GOT IT.

8              MR. RIFKIN:  THERE'S NOTHING IN THE RECORD TO

9    SUBSTANTIATE ANYTHING ELSE OTHER THAN THAT.  AND I THINK

10   THAT'S FAR MORE CONSISTENT WITH THE HISTORICAL FACTS THAN ANY

11   CONTRARY SUPPOSITION.

12             THE COURT:  AND THAT IS ORAL ADVOCACY.  I GOT IT.

13             MR. RIFKIN:  OKAY.

14             THE COURT:  WELL DONE --

15             MR. RIFKIN:  THANK YOU, YOUR HONOR.

16             THE COURT:  WELL DONE.  THANK YOU.

17             MR. RIFKIN:  THANK YOU.

18             THE COURT:  OKAY.

19             MS. LEMOINE:

20             MS. LEMOINE:  YES, YOUR HONOR.  THANK YOU.

21             SO, YOUR HONOR, I WANT TO JUST START BY ADDRESSING

22   THE POINT ABOUT THAT MR. RIFKIN MADE, THE POINT ABOUT THIS

23   NOTION THAT ASCAP HAS NEVER BEEN INVOLVED IN THE VALIDITY OF

24   THE COPYRIGHT HERE.

25             THE COURT:  MICROPHONE DOWN --

52

1          MS. LEMOINE:  OF COURSE.

2          THE COURT: -- SO WE CAN HEAR WHAT YOU SAY.

3          MS. LEMOINE:  AS YOUR HONOR POINTED OUT, ASCAP IS

4   CHARGED WITH ENFORCING OUR PUBLIC PERFORMANCE RIGHTS, SUMMY'S

5   PUBLIC PERFORMANCE RIGHTS.  IT HAS, AS MR. REIMER TESTIFIED,

6   FILED THOUSANDS OF INFRINGEMENT ACTIONS.  ALL RIGHT.  HE

7   COULDN'T SAY WHETHER ANY INVOLVED "HAPPY BIRTHDAY," BUT HE

8   SAID THEY FILED THOUSANDS OF INFRINGEMENT ACTIONS.

9          AS YOUR HONOR POINTED OUT, AN ESSENTIAL COMPONENT

10  --

11         THE COURT:  AND THAT'S -- AND THAT'S DISTINCT FROM

12  ACTIONS REGARDING THE VALIDITY OF A COPYRIGHT.

13         MS. LEMOINE:  WELL, AS YOUR HONOR POINTED OUT, IN

14  ORDER TO FILE THOSE ACTIONS YOU'D HAVE TO OWN THE COPYRIGHT.

15  AND YOU'D HAVE TO HAVE A VALID COPYRIGHT IN ORDER TO OWN IT.

16  SO, WE SAY IT'S SUBSUMED WITHIN THE QUESTION OF OWNERSHIP.

17         THE VALIDITY -- WHEN HE TESTIFIED AS TO THE

18  VALIDITY OF THE COPYRIGHT, I THINK WHAT HE HAD IN MIND WAS AN

19  ACTION LIKE THIS ONE IN WHICH PLAINTIFFS ARE SEEKING A

20  DECLARATORY RELIEF CLAIM ABOUT WHETHER IT'S VALID OR NOT.  I

21  THINK HE HAD THIS ONE IN MIND, BUT I DON'T KNOW.  WE'D HAVE

22  TO ASK MR. REIMER.

23         BUT HE DID SAY THAT THEY MAKE -- I MEAN, WE

24  UNDERSTAND, AND YOUR HONOR ARTICULATED IT VERY CLEARLY, THE

25  NATURE OF THE RELATIONSHIP BETWEEN ASCAP AND SUMMY.  ASCAP

53

1    EXISTS TO ENFORCE PUBLIC PERFORMANCE RIGHTS.  THE UNITED

2    STATES SUPREME COURT SAID THAT.  THAT'S HOW IT WAS FORMED IN

3    1914.

4            THE COURT:  DO I HAVE A COPY OF THE CONTRACT

5    BETWEEN SUMMY AND ASCAP?  I KNOW I HAVE THE WARNER AGREEMENT.

6            MS. LEMOINE:  I CAN SUBMIT THAT.  I THINK THAT WE

7    SUBMITTED IT.

8            MR. KAPLAN:  YES.

9            MS. LEMOINE:  MR. KAPLAN WILL HELP ME AND TELL ME

10   WHAT EXHIBIT IT IS.

11           THE COURT:  YES, HE WILL.

12           MS. LEMOINE:  WE DID SUBMIT THAT, YOUR HONOR, FROM

13   1975.

14           MR. KAPLAN:  EXHIBIT C OF THE KLAUS DECLARATION.

15           MS. LEMOINE:  IT'S EXHIBIT C TO MR. KLAUS'S

16   DECLARATION, YOUR HONOR.

17           THE COURT:  STAND BY.

18           (PAUSE IN PROCEEDINGS.)

19           THE COURT:  OH, OKAY.  I HAD SPENT TIME WITH

20   EXHIBIT D, WHICH WAS THE WARNER.

21           C IS THE?

22           MS. LEMOINE:  THEY'RE THE SAME, YOUR HONOR.

23           THE COURT:  OH, I SEE.  OKAY.

24           MS. LEMOINE:  SO --

25           THE COURT:  THERE ARE JUST SO MANY COPIES OF

54

1    DEPOSITION NOTICES AND LAWYER SNITAGRAMS THAT FRANKLY I WENT

2    BUZZING PAST, BUT --

3              BY THE WAY, JUST TO BE VERY CLEAR, THE ADDITIONAL

4    CASES THAT YOU REFERENCE, WHICH I'M FAMILIAR WITH, AND I WANT

5    TO GO BACK AND TAKE A LOOK AT AS WELL AS THE FULL DEPOSITION

6    THAT I MAY HAVE NOT TAKEN A LOOK AT.  I WILL SEE ALL OF IT.

7    AND I ASSURE YOU I'LL TAKE IT UNDER CONSIDERATION BEFORE I

8    MAKE A DECISION.

9              MS. LEMOINE:  WELL, LET ME JUST -- A LITTLE BIT

10   ABOUT THOSE TWO CASES, YOUR HONOR, SINCE YOU BROUGHT THEM UP.

11             I MEAN, IN THOSE CASES, WHICH ARE WITHIN THE

12   SOUTHERN DISTRICT OF NEW YORK, AS YOUR HONOR RECOGNIZED, IS A

13   COURT THAT'S VERY FAMILIAR WITH ASCAP.  THE QUESTION WAS

14   WHETHER THE DEFENDANT BAR OWNER COULD IMPLEAD ASCAP AS A

15   NECESSARY PARTY.  IT WAS NOT ABOUT WHETHER ASCAP WAS A

16   LICENSING AGENT.  IT WAS ABOUT WHETHER ASCAP WAS A NECESSARY

17   PARTY.  BOTH OF THOSE CASES WHICH BOTH INVOLVED -- ONE IS

18   SPRINGSTEIN; THE OTHER IS OCASEK, DOORS MUSIC, I THINK.  NO.

19   I THINK THAT'S THE -- SPRINGSTEIN OCASEK IS THE CASE THAT MR.

20   RIFKIN CITED.

21             THE COURT:  WHICH IS CONFUSING BECAUSE RICK OCASEK

22   WAS THE LEAD SINGER FOR THE CARS.

23             MS. LEMOINE:  YOU'RE RIGHT.  YOU'RE RIGHT.  THAT'S

24   REALLY EMBARRASSING.  WE NEED TO --

25             SO --

55

1          THE COURT:  IS HE A CLIENT?

2          MS. LEMOINE:  OF MINE?

3          THE COURT:  YES.

4          MS. LEMOINE:  NO.

5          THE COURT:  OH, OKAY.

6          MS. LEMOINE:  SO --

7          THE COURT:  ALL RIGHT.  SO, I MEAN -- SO, YOU'RE

8   GOING TO DISTINGUISH THESE CASES BECAUSE THEY DON'T DEAL WITH

9   THE EXISTENCE OF --

10          MS. LEMOINE:  NO.

11          THE COURT:  -- ATTORNEY-CLIENT RELATIONSHIP.

12          MS. LEMOINE:  THEY DO NOT.  THEY DEAL WITH THE --

13   SORT OF A QUESTION OF FEDERAL CIVIL PROCEDURE, WHETHER

14   THEY'RE A NECESSARY PARTY AND HAVE TO BE INVOLVED IN ANY

15   INFRINGEMENT ACTION.

16          THE COURT:  OKAY.

17          MS. LEMOINE:  I WANT TO TALK BRIEFLY ABOUT -- YOU

18   KNOW, MR. RIFKIN SAID A FEW TIMES THAT IT'S OUR BURDEN.  AND

19   THAT'S TRUE.  IT'S OUR BURDEN.  BUT I THINK YOUR HONOR HAS IT

20   EXACTLY RIGHT WHEN YOU LOOK AT WHAT IS THE MORE PROBABLE

21   CONCLUSION TO DRAW BASED ON THE PARTIES' RELATIONSHIP.  AND

22   THAT'S FRANKLY THE STANDARD.  YOU KNOW, IS IT MORE LIKELY

23   THAT MS. SENGSTACK JUST BUMPED INTO MR. CORMAN AND THOUGHT,

24   HEY, LET ME SEND YOU THIS OR THAT SHE SENT IT GRATUITOUSLY.

25   OR IS IT MORE LIKELY THAT BECAUSE OF THEIR RELATIONSHIP -- IS

1  THE INFERENCE THAT YOUR HONOR HAS DRAWN MORE CONSISTENT WITH

2  WHAT WE UNDERSTAND ABOUT THEIR RELATIONSHIP, WITH WHAT THE --

3  THE FACT THAT HE IS THE GENERAL COUNSEL OF ASCAP, THE FACT

4  THAT SHE SAYS HERE'S THE ANALYSIS --

5          THE COURT:  WAIT.  WAIT.

6          MS. LEMOINE: -- ABOUT OUR CLAIM.

7          THE COURT:  WOULDN'T THE PROPER FORMULATION BE

8  WHETHER WARNER HAS ESTABLISHED BY A PREPONDERANCE OF THE

9  EVIDENCE THAT IT'S MORE LIKELY THAN NOT --

10         MS. LEMOINE:  CORRECT.

11         THE COURT: -- THAT THAT RELATIONSHIP OCCURRED.

12         MS. LEMOINE:  THAT IS -- THAT IS CORRECT.

13         THE COURT:  OKAY.

14         MS. LEMOINE:  AND IN LIGHT OF THE RECORD EVIDENCE

15 THAT -- ABOUT THE RELATIONSHIP BETWEEN ASCAP AND SUMMY,

16 ASCAP'S RESPONSIBILITY AS THE LICENSING AGENT, ASCAP'S ROLE

17 IN INFRINGEMENT ACTIONS, IN ENFORCING, IN POLICING THE

18 COPYRIGHT, IT'S MUCH MORE PLAUSIBLE -- WE THINK THE ONLY

19 PLAUSIBLE CONCLUSION, FRANKLY, IS THAT SHE SENT THIS FOR ONE

20 OF THOSE PURPOSES, FOR SOME PURPOSE OTHER THAN JUST AN FYI.

21         AND I THINK, YOU KNOW, PLAINTIFF'S CONTENTION THAT

22 IT WAS GRATUITOUS, YOU KNOW, NOW IS JUST -- IT CAN'T BE

23 SUSTAINED.

24         NOW, WHETHER SHE DID THIS TO OBTAIN LEGAL ADVICE,

25 WHICH I THINK IS A FAIR INFERENCE, AND WHETHER SHE DID IT

1  BECAUSE THEY HAD A COMMON INTEREST IN THE LEGAL QUESTION,

2  WHICH I THINK THE EVIDENCE SHOWS THAT THEY DID, EITHER ARE A

3  BASIS FOR YOUR HONOR TO UPHOLD THE PRIVILEGE IN THIS

4  INSTANCE.

5       THE COURT:  AND WHAT'S -- WHAT'S THE EVIDENCE

6  SUPPORTING THE CONCLUSION THAT MS. SENGSTACK -- HEY, I

7  FINALLY GOT IT -- WAS SEEKING LEGAL ADVICE --

8       MS. LEMOINE:  WELL, I THINK THE --

9       THE COURT:  -- AS OPPOSED TO PROVIDING INFORMATION

10  IN ANTICIPATION OF COMMON LITIGATION.  LET'S DISTINGUISH THE

11  TWO, IF POSSIBLE.

12       MS. LEMOINE:  SURE.  I THINK WE LOOK AT THE

13  TRANSMITTAL LETTER.

14       THE COURT:  OKAY.

15       MS. LEMOINE:  EITHER -- EITHER INTERPRETATION I

16  THINK IS POSSIBLE, THAT SHE SENT IT FOR THE PURPOSE OF

17  OBTAINING HER OWN ASSOCIATION-RELATED LEGAL ADVICE.  DID SHE

18  HAVE SOME QUESTION FOR HIM ABOUT WHETHER ASCAP COULD LICENSE

19  THE WORK, OR DID SHE SEND IT BECAUSE ASCAP ITSELF HAD A

20  QUESTION AND ASCAP HAD A CONCERN AND ANTICIPATED FUTURE

21  CLAIMS LIKE THE ONE THAT MR. RIFKIN HAS BROUGHT HERE.  THAT

22  IS VERY POSSIBLE.  BOTH ARE EQUALLY PLAUSIBLE AND MORE

23  PLAUSIBLE WE SAY THAN THE CONTENTION THAT IT WAS JUST BECAUSE

24  THEY BUMPED INTO EACH OTHER ON THE STREET.

25       YOU KNOW, IF YOU LOOK AT THE TRANSMITTAL LETTER

58

1    ITSELF, FIRST YOU LOOK AT THE AGREEMENT BETWEEN SUMMY AND

2    ASCAP WHERE YOU SEE THAT THEIR ROLE IS AS FIRST IN 1(A) IS TO

3    ENFORCE --

4              THE COURT:  UH-HUM.

5              MS. LEMOINE: -- THE COPYRIGHT.  IF YOU UNDERSTAND

6    WHAT THE BASIS OF THE RELATIONSHIP IS, IF YOU LOOK AT THE

7    ARTICLES OF THE ASSOCIATION FOR ASCAP, THEIR PURPOSE IS.  IF

8    YOU LOOK AT THE TRANSMITTAL LETTER SHE SAYS, HERE'S AN

9    ANALYSIS ABOUT OUR CLAIM, THE RIGHTS AND THE WORK AS

10   DISCUSSED.  THEY HAD A PREVIOUS CONVERSATION.  THE ONLY REAL

11   LOGICAL CONCLUSION IS THAT SHE DID THAT FOR ONE OF THE

12   PURPOSES THAT ASCAP SERVES AS A BUSINESS.  SHE SENT IT TO THE

13   GENERAL COUNSEL FOR A REASON.

14             THE COURT:  OKAY.

15             MS. LEMOINE:  AND, YOUR HONOR --

16             THE COURT:  I GOT IT.

17             MS. LEMOINE:  OKAY.  IF -- DOES YOUR HONOR HAVE ANY

18   FURTHER QUESTIONS FOR THE PARTIES?

19             THE COURT:  I WOULD ASK -- NOT OF YOU.

20             I WOULD ASK -- WELL, I GUESS MY QUESTION FOR THE

21   PLAINTIFFS IS YOU WERE FORMALLY ASKING THE COURT TO OVERRULE

22   THE CLAIM OF PRIVILEGE.  AND THEN YOU WANTED SOMETHING ELSE.

23             MR. RIFKIN:  WELL --

24             THE COURT:  AND I WASN'T ENTIRELY SURE WHAT ELSE

25   YOU WANTED.

59

1          MR. RIFKIN: -- WE DID.  ALTHOUGH, I THINK IT BECAME

2     MOOT.

3          THE COURT:  OKAY.

4          MR. RIFKIN:  WHAT WE HAD ASKED FOR WAS SOME

5     ADDITIONAL DISCOVERY, BUT THEN IN THE INTERIM ASCAP AGREED TO

6     ALLOW MR. -- ASCAP AGREED TO ALLOW MR. REIMER TO COME BACK

7     AND ANSWER SOME MORE QUESTIONS.  HE DID.  AND THE DEFENDANTS

8     AGREED TO PRODUCE ANOTHER WITNESS.  THEY DID.  SO, OUR

9     REQUEST FOR ADDITIONAL DISCOVERY REALLY BECAME MOOT.

10         I THINK THE RECORD --

11         THE COURT:  OKAY.

12         MR. RIFKIN:  -- FACTUALLY IS AS COMPLETE AS IT'S

13    EVER GOING TO BE.

14         THE COURT:  OKAY.  OH, NO, AND THAT CLARIFICATION

15    HELPS.  BECAUSE WE HAD A VERY HURRIED CALL A COUPLE OF WEEKS

16    AGO WHEN I WAS IN A HOTEL LOBBY.  AND --

17         MR. RIFKIN:  I RECALL IT.

18         THE COURT:  -- I DIDN'T MEAN TO BE CURT WITH YOU

19    ALL, BUT THINGS WERE GOING.  AND I WAS OUT OF TOWN.  AND --

20    OKAY.

21         SO, THAT -- THAT MAKES SENSE.  THE GIST OF THE

22    REQUESTED RELIEF IS TO DEAL WITH THE ASSERTION OF PRIVILEGE.

23    GOT IT.

24         MR. RIFKIN:  AT THIS POINT THAT'S CORRECT.

25         THE COURT:  OKAY.

60

1        MS. LEMOINE:  IF I COULD JUST -- ONE MORE POINT IF

2   I COULD MAKE, YOUR HONOR.

3        MR. RIFKIN IS MUCH TALLER THAN I AM.

4        THE COURT:  HE IS.

5        MS. LEMOINE:  MR. REIMER'S TRANSCRIPT IS ATTACHED

6   -- PORTIONS OF IT ARE ATTACHED TO EXHIBIT A TO THE

7   DECLARATION I SUBMITTED WITH OUR SUPPLEMENTAL BRIEF.

8        HE TESTIFIED CONSISTENT WITH YOUR UNDERSTANDING OF

9   WHAT ASCAP'S ROLE IS.

10       HE -- I JUST WANT TO ADDRESS JUST BRIEFLY THIS

11  NOTION THAT THIS LETTER HAD TO CONTAIN AN EXPLICIT REFERENCE

12  TO LEGAL ADVICE AND THINK ABOUT -- YOU KNOW, THE PASSAGE OF

13  TIME AND THE NATURE OF COPYRIGHT AS YOUR HONOR POINTED OUT,

14  AND THAT, YOU KNOW, WHAT WE'RE TRYING TO DO HERE IS MAKE

15  ASSUMPTIONS ABOUT THIS ENCOUNTER ON THE STREET.

16       BUT HAVING AN EXPLICIT REQUIREMENT THAT THERE BE

17  SOMETHING SAYING I AM ASKING FOR LEGAL ADVICE, OR I AM

18  SENDING THIS TO YOU AND PURSUANT TO OUR COMMON INTEREST

19  DOCTRINE WOULD JUST BE CONTRARY TO THE POLICY UNDERLYING THE

20  COPYRIGHT ACT, WHICH GRANTS THESE COPYRIGHTS FOR A PERIOD OF

21  TERMS OF SEVERAL DECADES.  SO, I WOULD ALSO SUBMIT THAT TO

22  YOUR HONOR.

23       THE COURT:  OKAY.

24       MS. LEMOINE:  ALL RIGHT.

25       MR. RIFKIN:  YOUR HONOR, THE ONLY OTHER THING I'LL

61

1    ADD IS WHILE WE HAVE THE LETTER FROM MRS. SENGSTACK --

2              THE COURT:  YES.

3              MR. RIFKIN:  -- OPEN, SHE SAYS AT THE VERY BOTTOM

4    WHEN SHE SENDS -- SHE REFERS TO BOTH THE LONG ANALYSIS, THE

5    1976 ANALYSIS AND THEN THE SHORT --

6              THE COURT:  UH-HUM.

7              MR. RIFKIN:  -- 1978 ANALYSIS.  AND IN REFERRING TO

8    THE FOLLOW-UP LETTER SHE SAYS --

9              THE COURT:  "IT MIGHT BE OF INTEREST."

10             MR. RIFKIN:  -- "IT MIGHT BE OF INTEREST."

11             SHE DOESN'T SAY IT MIGHT BE HELPFUL.  SHE DOESN'T

12   SAY IT MIGHT BE USEFUL.  YOU MIGHT BE ABLE TO MAKE USE OF IT.

13   SHE SAYS IT MIGHT BE OF INTEREST.

14             THE COURT:  YOU KNOW, THIS IS -- THIS IS -- THIS IS

15   LIKE THE BEST PART OF IT.  IT'S SMART PEOPLE TRYING TO FIGURE

16   OUT WHAT SMART PEOPLE WERE DOING.  I MEAN, THERE'S THINGS

17   HERE FOR BOTH SIDES.  AND YOU'VE BOTH DONE A FINE JOB.  I

18   MEAN, WE COULD TALK ABOUT HOW IT'S ON THE FIRM'S LETTERHEAD

19   AS OPPOSED TO A PERSONAL STATIONARY.  WE COULD TALK ABOUT HOW

20   SHE ADDRESSES HIM BY HIS FIRST NAME --

21             MR. RIFKIN:  BERNIE --

22             THE COURT:  -- RATHER THAN HIS FORMAL TITLE.  YOU

23   KNOW, THERE'S -- THERE'S STUFF FOR BOTH HERE.

24             MR. RIFKIN:  THERE'S GRIST FOR BOTH MILLS.  AND YOU

25   ULTIMATELY HAVE TO DECIDE WHETHER THEY HAVE GROUND UP ENOUGH

62

1   TO --

2           THE COURT:  THE JOKE IS THAT'S WHY I GET THE BIG

3   BUCKS.

4           MR. RIFKIN: -- TO --

5           THE COURT:  ALL RIGHT.  HERE'S WHAT'S GOING TO

6   HAPPEN.  I AM GOING TO CLEAR MY AFTERNOON BECAUSE OF THE

7   SIGNIFICANCE OF THIS ISSUE FOR BOTH PARTIES.  I AM GOING TO

8   TAKE AN ADDITIONAL LOOK AT YOUR MATERIALS, PARTICULARLY THE

9   ONES THAT WERE HIGHLIGHTED HERE TODAY, WHICH IS HELPFUL IN

10  FOCUSING ON WHAT I NEED TO DO.

11          I WILL TRY AND GET OUT A DECISION.  YOU MAY FEEL

12  CONFIDENT THAT TO THE EXTENT THAT MY -- I'M NOT GOING TO MAKE

13  UP MY FINAL MIND.  BUT IF I -- IF I -- IF I STICK WITH WHAT

14  MY TENTATIVE IS GOING TO BE, YOU CAN APPROPRIATELY REFER TO

15  BOTH THE STATEMENTS YOU HEARD HERE TODAY AS WELL AS THE

16  WRITTEN DECISION, WHICH IS KIND OF MY CUSTOM.  IT WON'T BE --

17  IT WON'T BE A ONE-PAGER, BUT, YOU KNOW, I'M GOING TO MAYBE

18  SHORTHAND SOME OF THE THINGS THAT I'VE SAID HERE.

19          IF THERE IS A DESIRE TO TAKE THIS TO CHIEF JUDGE

20  KING ON APPEAL, NO PROBLEM WITH ME.  BUT HE IS GOING TO DEFER

21  TO SOME OF THESE FACTUAL CONCLUSIONS.

22          BUT BOTH SIDES WOULD BE WELL SERVED IF THERE IS

23  GOING TO BE ADDITIONAL PROCEEDINGS HERE TO FOCUS ON THOSE

24  ISSUES AS OPPOSED TO SOME OF THE OTHER THINGS THAT CAUSE THIS

25  STACK OF PAPER TO BE SEVERAL INCHES HIGH.  BUT I WILL TRY AND

63

1  GET THAT OUT TODAY.

2          MS. LEMOINE:  COULD I GIVE YOU ONE CITE, YOUR

3  HONOR, BEFORE WE WALK OUT OF THE ROOM.

4          THE COURT:  HEY, WHY NOT.

5          MS. LEMOINE:  SO, MR. KAPLAN JUST POINTED THIS OUT

6  TO ME.  IN THE DISTRICT OF THE DISTRICT OF COLUMBIA, THERE'S

7  A PRESUMPTION THAT COMMUNICATIONS TO OUTSIDE COUNSEL OR THE

8  GENERAL COUNSEL OF THE COMPANY ARE PRIMARILY RELATED TO LEGAL

9  ADVICE.

10          BOCA INVESTORING PARTNERSHIP --

11          THE COURT:  I'M SORRY.  YOU'RE CITING SOMETHING NOW

12  THAT YOU DIDN'T CITE IN THE TWO PREVIOUS BRIEFS?

13          MS. LEMOINE:  I THINK WE DID.

14          DIDN'T WE?

15          MR. KAPLAN:  NO.

16          MS. LEMOINE:  OKAY.  IF WE DIDN'T, THEN, I'M GOING

17  TO SIT DOWN.

18          THE COURT:  YES.  YES, YOU ARE.

19          MS. MANIFOLD:  THANK YOU, SIR.

20          THE COURT:  UNLESS -- UNLESS YOU WANT ADDITIONAL

21  BRIEFING --

22          MS. LEMOINE:  NO --

23          THE COURT:  -- AND -- YES.

24          MS. LEMOINE:  NO.  PLEASE GOD, NO.  I DON'T THINK

25  ANY OF US WANT THAT.

64

1          THE COURT:  ALL RIGHT.  OR RULE 37 TO COME BACK

2    INTO PLAY.

3               ANYTHING ELSE FOR YOU FOLKS?

4               MR. RIFKIN:  NONE, YOUR HONOR.

5               THANK YOU VERY MUCH FOR YOUR TIME, AS ALWAYS.

6               THE COURT:  NOT AT ALL.

7               THANK YOU VERY MUCH --

8               MS. LEMOINE:  THANK YOU.

9               THE COURT: --  FOR A VERY HIGH-LEVEL -- HIGH-LEVEL

10   WORK ON THIS.

11              THE CLERK:  COURT IS ADJOURNED.

12              (PROCEEDINGS ADJOURNED AT 10:56 A.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

65

1

2                        C E R T I F I C A T E

3

4            I CERTIFY THAT THE FOREGOING IS A CORRECT

5    TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE

6    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8

9

10   /S/ DOROTHY BABYKIN                    7/30/14

11   _____        _____

12   FEDERALLY CERTIFIED TRANSCRIBER        DATED

13   DOROTHY BABYKIN

14

15

16

17

18

19

20

21

22

23

24

25